**In re TUDOR MOTOR LODGE ASSOCIATES, LIMITED PARTNERSHIP, t/a Days Inn, formerly t/a Best Western; Country Squire; Best Western Tudor Inn; and Tudor Inn, Debtor.**

**Bankruptcy No. 88–07103.**

United States Bankruptcy Court,
D. New Jersey.

June 26, 1989.

**938**

Sherman, Silverstein & Kohl by Robert W. Lynch, Pennsauken, N.J., for debtor.

Carpenter, Bennett & Morrissey by Francis X. Ferrara, Newark, N.J., for Days Inns of America Franchising, Inc.

Davis, Reberkenny & Abramowitz by Arthur J. Abramowitz, Richard L. Schepacarter, Cherry Hill, N.J., for Midlantic Nat. Bank/South.

Weinberg & McCormick by Barry Chatzinoff, Haddonfield, N.J., for Limited Partners.

## OPINION

ROSEMARY GAMBARDELLA, Bankruptcy Judge.

The matter before the court is a motion for relief from the automatic stay to enforce termination of an executory contract filed by Days Inns of America Franchising, Inc. ("DIAF" or "movant") against Tudor Motor Lodge Associates, Limited Partnership ("Tudor Motor Lodge" or "debtor"). The motion was filed by DIAF on February 8, 1989. The court heard oral argument on the matter on March 13, 1989 and reserved opinion until this time. At the hearing, DIAF produced the following witnesses: Joel R. Buckberg, vice president, assistant general counsel and assistant secretary of DIAF; and Susan Christine Bagby, quality assurance representative for DIAF. The debtor produced George Steen, general manager of the Tudor Motor Lodge. For the reasons that follow, the court grants DIAF's motion. The following constitutes this court's findings of fact and conclusions of law.

Tudor Motor Lodge is a limited partnership formed under New Jersey law in 1985 which owns and operates a 120 unit hotel located at 2385 Marlton Pike, also known as Route 70, in Cherry Hill, New Jersey. On October 28, 1988, the debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984, and the Bankruptcy Judges, United States Trustees and Family Farmer Bankruptcy Act of 1986 ("Bankruptcy Code"). Prior thereto, on June 16, 1987, the debtor entered into a License Agreement with DIAF (M-1). Days Inn of America, ("DIA") owns, and its subsidiary, DIAF, has the right to license, the so-called "distinctive system" operated under the Days Inn "marker" and "system standards." The term "system", as defined in the License Agreement, refers to "a comprehensive system for the delivery of transient lodging services which ... includes ... the DAYS INN service marks, logos and derivations ..., names, slogans, commercial symbols, trade marks and service marks ..., system hotel trade dress and associated business goodwill 5; Tr. of March 13, 1989 at 19 (hereinafter "Tr. at ——"). The terms "marks" and "entitlements" refer to federally registered service marks and certain non-registered confidential information that comprise the intellectual property portion of the Days Inn System. (*See* License Agreement at 9; Tr. at 15–16). These are licensed under the License Agreement to the licensee to use in connection with the business of operating lodging services under the Days Inns name. (Tr. at 16).

The License Agreement between the debtor and DIAF entitled the debtor to a limited, non-exclusive license to operate a Days Inn Franchise Hotel using the DIAF system and the benefits thereof. The debtor paid an initial $3,000.00 application fee and a $25,000.00 franchise fee as initial consideration for the License Agreement. The License Agreement contemplated con-

tinued fees in the form of monthly royalties, reservation system user fees, taxes and interest.

In addition, the debtor was obliged to adhere to certain "system standards" (*See* License Agreement ¶ 16(a)), which DIAF and/or DIA had the "right to control and establish requirements applicable to all aspects of the System, including without limitation for Marks usage, and for Hotel construction, decoration, interior and exterior signage, quality assurance and guest services (collectively the "system standards") associated with the System." (*See* License Agreement, ¶ 11).

Tudor's obligations under the License Agreement with respect to construction and signage terms are also relevant to this proceeding. Paragraph 4 of the License Agreement provided in relevant part that Tudor must complete construction obligations in accordance with Schedule B to the Agreement or DIAF may, at its sole discretion, terminate the License Agreement at any time prior to the "commencement date."[1] Schedule "B" provided:

### Construction Obligation

(Subject to compliance with the Design Standards, which are incorporated herein by reference)

1. A Construction Obligation is required by DIAF. Improvements must be made to the Hotel to the extent necessary to achieve minimum Quality Assurance inspection test scores of 370 prior to commencing operation of the Hotel under the System, 400 within six (6) months after the Opening Date and 425 within twelve (12) months after the Opening Date. Licensee must commence refurbishing on or before June 30, 1987 and pass a Quality Assurance inspection with a score of 370 or better on or before

August 31, 1987 to satisfy the Construction Obligation.

The License Agreement defined Commencement Date as follows:

Operation of the Hotel under the System may begin on a date (the "Opening Date") to be selected by Licensee only after DIAF gives Licensee a written certificate that Licensee has completed the Hotel in accordance with its Construction Obligation; and that the Hotel meets, in DIAF's sole discretion, all applicable Systems Standards. The date such certificate is issued shall be the Commencement Date.

Exhibit B to the License Agreement, entitled "Punchlist Summary", required Tudor to install Days Inn signage, and eliminate all Best Western and Tudor Inn signage, prior to entering the Days Inn System. Exhibit B also recommended that Tudor complete renovation (interior and exterior) of its "300" building within six months after entering the Days Inn System.

The Construction Obligation in Exhibit B of the License Agreement was modified by letter of May 22, 1987 from John J. Buck, Jr., General Partner of the debtor to DIAF as follows:

II. ITEMS RECOMMENDED FOR COMPLETION WITHIN SIX MONTHS AFTER ENTERING THE DAYS INN SYSTEM:

1. *Complete renovation (interior and exterior) of the "300" building. Note: Additional punchlist items may be required after opening of "300" building.* This is not agreeable to Tudor Inn. The Tudor Inn will comply with the interior/exterior renovations of "300" building within six months time after entering the Days Inn System. It is mutually agreed as per our conversation with Mr. Keeble and Mr. Snodgrass that addi-

---

1. Paragraph 4 of the License Agreement provided in pertinent part:

   *Construction Obligation.* This Section shall be operative if DIAF so specifies in the attached Schedule B. Licensee must complete the Construction Obligation, in accordance with attached Schedule B, and the confidential "Planning and Design Standards Manual" or any successor publication (containing de-

sign standards and other specifications for construction, materials, facilities, layout, landscaping, interior design and decoration, F/F/E, operation supplies, staff uniforms and the like; collectively, the "Design Standards"). Otherwise, DIAF may, at its sole discretion, terminate this Agreement at any time prior to the Commencement date, by giving Licensee written notice thereof.

tional punchlist items *will not* be required, however, the "300" building will be completed to represent the same finished product as that reflected in "100" and "200" buildings.

Buckberg testified that the signage obligation was also modified by that letter as follows:

I. ITEMS TO BE COMPLETED PRIOR TO ENTERING THE DAYS INN SYSTEM:

EXTERIOR:

1. *Install Days Inn Signage.* As per our conversation with Bill Keeble and Jon Snodgrass as well as yourself, the new signage recently installed at both the front and back of the property will remain with the plastic lens (face) of both signs which currently reads "The Tudor Inn & Conference Center" to be changed to read "Days Inn & Conference Center" with the remaining portion of both signs staying the same. The Days Inn logo and color specifications will be met and prior to making these lens' we will submit to Mr. Don Mathis to make sure the logo and colors are correct. Until such time as the above signs are complete, temporary "Days Inns" banners will be purchased from Days Inn and displayed.

2. The License Agreement provided in pertinent part in regard to "Termination":

19. *Termination*

(b) *DIAF Termination with Notice.* DIAF may terminate the License at any time effective upon the date specified in the termination notice (or the earliest date permitted by applicable law) if: (i) Licensee fails to cure any monetary breach within 10 days after receipt of DIAF's written payment demand; (ii) Licensee fails fully to remedy any other breach of its obligations or warranties under this Agreement within 30 days (or such longer time as DIAF may in writing allow; or within 10 days if during the 12 months immediately preceding the notice of breach, Licensee has received and cured another notice of the same breach) after receipt of written notice from DIAF specifying one or more breaches of this Agreement; (iii) the Hotel shall not be operated in the normal course of business caused by an act of God or other casualty and Licensee certifies to DIAF in writing given within 20 days after such event that the Hotel will be operating normally within 120 days after such notice to DIAF (or a longer period with DIAF's prior written consent), and Licensee in fact pursues diligently repair of the Hotel,

Buckberg testified that while the May 22, 1987 letter set forth no specific time period when the temporary banner would be removed, he understood that "as soon as possible the banners would be replaced with permanent signage." (Tr. at 36). He further noted that while Mr. Buck by the aforementioned letter extended the deadline for certain items he wanted to complete, nothing varied the signage terms of the License Agreement which require completion prior to entering the System. (Tr. at 36).

The License Agreement was executed by John J. Buck, Jr., general partner of Tudor Motor Lodge, and John D. Snodgrass, Senior Vice President Franchising of DIAF. It is noteworthy. that, in addition to signing the franchise agreement in his capacity as general partner of Tudor, Buck executed a "Guarantee Agreement", obligating himself personally to all the terms of the License Agreement and any amendments thereto.

On June 14, 1988 Joel R. Buckberg, in his capacity as Assistant Vice President and Assistant General Counsel of DIAF, issued a "Notice to Cure" letter[2] to the debtor which provided in relevant part:

then DIAF's termination rights will be suspended for that period, provided that the Hotel may reopen as a System hotel only after receipt of DIAF's written certification that the Hotel meets all applicable System Standards; (iv) Licensee fails to prevent a material Hotel condemnation or otherwise loses possession or the right to possession of all or a significant part of the Hotel; (v) Licensee defaults in the performance of the terms and conditions of any other agreement with DIAF, DIA or their affiliates, or any mortgage, deed of trust or lease covering the Hotel, and fails to cure such default within the time permitted by the applicable instrument; (vi) Licensee knowingly maintains false books or records, or knowingly submits any false report to DIAF; (vii) Licensee fails to take appropriate steps (including any action directed in System Standards Manuals and/or requested in writing by DIAF) to remedy violations of its Sections 10, paragraph (f) or 11 paragraph (b) confidentiality agreements signed by its employees and other disclosees. In any judicial proceeding in which the validity of termination is at issue, DIAF will not be limited to the reasons set forth in any notice sent under this Section.

This letter is notice that Tudor Motor Lodge Associates Limited Partnership ("Licensee") is in default of its obligation to complete its Construction Obligation pursuant to Section 4 and Schedule "B" of the License Agreement. Pursuant to the License Agreement, Licensee was to install signage approved by Days Inns of America Franchising, Inc. ("DIAF") prior to commencing operation of the Hotel as a Days Inn System Hotel. Licensee commenced operation of the Hotel as a Days Inn System Hotel on July 1, 1987. To date, the DIAF approved signage has still not been installed. The banners currently in use are inappropriate and poorly maintained. This default is material and requires your immediate attention. Pursuant to the terms of the License Agreement, Licensee has thirty (30) days from the date of receipt of this notice to cure the default to DIAF's satisfaction. This letter also serves as notice that should Licensee fail to cure this default within the time permitted, Licensee's additional termination rights under Section 24(f) shall automatically terminate.

The Hotel will be inspected shortly after the expiration of the thirty (30) day cure period. Licensee is hereby notified that if the default is not cured to DIAF's satisfaction within the thirty (30) day cure period, DIAF may suspend Days Inn Reservation System Service and terminate the License to operate the Hotel under the Days Inn system sixty (60) days from the date Licensee receives this notice.

Licensee is advised that in the event of a License termination, its obligation to comply with the post-termination provisions imposed by the License Agreement and Franchise Operating Policies Manual shall remain in full force and effect. DIAF will insist upon strict performance of such obligations.

(M–12).

On June 17, 1988, Charles G. Resnick, Esquire, counsel for the debtor, wrote a letter to DIAF which stated in relevant part:

My client is making every effort to get the sign revised and upgraded in accordance with their agreement and wishes of Days Inns. Unfortunately, delays have been experienced from a variety of sources due to the number of people having to be dealt with and that is what has caused this problem. Arrangements are being finalized to purchase the signplates necessary and have the construction work done by Garden State Sign Company to get this sign installed at the very earliest time. It is unknown whether that can be done within the next 30 days as the Cure Notice requires. In the event you find due diligent efforts have been expended but the 30–day deadline cannot be met, I would ask your indulgence in a modification of this date. Having had ample experience with construction obligation deadlines in pending litigation with the Garden Park case, I do not want to run afoul of the Days Inns license agreement by not having properly extended this time frame.

On July 11, 1988, Buckberg, on behalf of DIAF, transmitted a letter to the Debtor entitled "Termination of Days Inn System License" (M–4). That letter was received by the Debtor on July 16, 1988, as evidenced by the receipt of certified mail attached to DIAF's moving papers. The termination letter states in pertinent part:

Pursuant to Section 4 and Schedule "B" of the License Agreement dated June 16, 1987 ("License Agreement") for the operation of the Hotel, Licensee, Tudor Motor Lodge Associates Limited Partnership ("Licensee") was to achieve a minimum Quality Assurance score of 425–B within twelve (12) months after its Opening Date. This deadline to achieve this 425–B score was July 1, 1988. Days Inns of America Franchising, Inc. ("DIAF") reminded Licensee of this obligation by letter dated May 19, 1988. A Quality Assurance inspection performed on July 8, 1988, resulted in a score of 402, failing to achieve the minimum score required by a substantial margin.

(M–1).

DIAF has also received word through counsel that Licensee will be unable to complete installation of signage by the time required in our previous letter notifying Licensee of the default regarding signage.

In accordance with the terms of the License Agreement, DIAF hereby acknowledges the termination of Licensee's rights to operate the Hotel pursuant to the Days Inn System License granted under the License Agreement, effective sixty (60) days after Licensee's receipt of this letter. Licensee's rights to use the Reservation System Interface Software under the Software License Agreement with DIAF, and to use the satellite equipment under the Satellite Communications Agreement are also terminated.

(M-4) (hereinafter "Termination Notice").

By way of letter dated July 13, 1988, Charles G. Resnick, Esquire, attorney for the debtor, responded to Buckberg's termination notice with the following proposal:

My client's proposal to cure the ills which may exist in its relationship with Days Inns, contained below, is made strictly without prejudice to the rights of my client and is specifically contingent upon receipt of written reassurance from Days Inns that if the following proposal, as suggested or ultimately modified, is agreed upon that my client will continue to function in the Days Inn System in good standing as has been true in the past. With these understandings, my client proposes to do the following:

1. The reservation fees of $7,779 will be paid in full within 30 days of the date a letter of reassurance is received from you revoking the termination letter and providing affirmative assurance to my client that it will remain in the Days Inn system subject to compliance with the terms of this proposal.

2. Days Inns will provide assistance to my client in negotiating a better deal with Heath and Company and Garden State Sign for a cheaper price to do the sign including installation being requested by Days Inns and financial assistance to pay for same as per previous agreements between the parties. A written letter of such agreement and extension of time should be issued. Thereafter, the sign should be able to be installed within 30–45 days.

3. A brief period to permit repairs, perhaps 60 days, would be afforded to comply with requests set forth in the QA inspection with the exception of the sign, 3 Building and step repairs. Frankly, many of the items docked on the QA inspection report are not as severe as the point deductions would indicate and are easily curable.

4. My client will commit to resolving the structural problems and renovate the remainder of the exterior structure of 3 Building within 90 days of our agreement to reactivate this license. No rentals would take place in that building until the interior is renovated to match existing rooms in other buildings as previously agreed.

(M-5).

On August 3, 1988 DIAF transmitted a letter to the debtor indicating that a workout arrangement had been reached between the parties. The August 3, 1988 letter stated in pertinent part:

This letter confirms the agreement reached between the parties regarding reinstatement of the Days Inn System license for this Hotel terminated by the letter of Days Inns of America Franchising, Inc., dated July 11, 1988. The letter also supercedes the letters of July 13 and July 22 on the same subject exchange between the parties, as well as all prior oral communications.

DIAF is willing to delay enforcement of the termination, and will reinstate the Days Inn System license of the Hotel and withdraw the termination if Tudor Motor Lodge Associates Limited Partnership (the "Licensee") complies with the following conditions:

1. On August 10, 1988, Licensee pays accrued, unpaid Reservation System User Fees of $7,779.00, Monthly Royalties for the months of June 1988

and July 1988, and all other amounts outstanding under invoices previously sent to Licensee, if any.

2. Licensee renovates and improves the Hotel to the point where it scores at least 425 on a DIAF quality assurance inspection. These improvements should include the items listed on the attachment to the July 22 letter, to the extent feasible, and those items listed under the Marginal section of the July 8 inspection report attached to the July 22 letter, provided that Licensee will be required only to continue working diligently on the "300 building" and such building will not be considered as part of the inspection to determine whether Licensee has met the 425 score requirement. These renovations must be completed on or before October 4, 1988. During the period of renovation, the 300 building must be taken out of service and repaired and renovated to achieve a minimum score of 425 and meet Days Inn System Standards. Such repairs and renovations on the 300 building must be completed within 90 days. Licensee will also be afforded 90 days to complete scraping and painting of soffits.

3. DIAF acknowledges that George Steen has completed the required training programs.

4. Licensee will complete installation of Days Inn system signage for the Hotel conforming to applicable System Standards within 15 days after receiving the 425 quality assurance inspection score. Such installations will conform to the installation proposed on the attachment hereto. DIAF will be obligated to provide no sign allowance or other monetary compensation or incentive to the Licensee with respect to the signage.

5. During the 60 day renovation period, the Hotel will be operated in accordance with the License Agreement, and Licensee will make all payments required under the License Agreement as and when due. DIAF will continue Reservation System service for the Hotel unless Licensee defaults under the terms of the License Agreement and fails to cure such default within the time permitted thereunder.

If the foregoing conditions are satisfied, DIAF will reinstate the License after completion of all of the items set forth above. If Licensee fails to complete the items set forth above and satisfy the conditions of this letter, the termination will become immediately effective upon notice from DIAF.

(M-6) (hereinafter "Workout Arrangement").[3]

Buckberg testified that his understanding of the Workout Arrangement (M-6) was that DIAF agreed merely to delay enforcement of the termination alluded to in the Termination Notice (M-4) and offered to reinstate the license if the conditions articulated in the Workout Arrangement (M-6) were satisfied (Tr. at 50). It was Buckberg's understanding that if the debtor failed to satisfy the conditions, termination would become effective immediately upon notice from DIAF. Buckberg testified that two significant changes were made to the Workout Arrangement (M-6) by Mr. Buck of Tudor Motor Lodge which DIAF agreed to. First, that the signage issue would be excluded from the October 4, 1988 quality assurance inspection even though, under normal conditions, signage is part of quality assurance inspections. Second, that construction requirements pertaining to the 300 building would provide that only the exterior of the 300 building be renovated to match other buildings on the property within 90 days, or by November 4, 1988. (Tr. at 53). According to Buckberg, the parties never agreed to the issuance of an additional 60 day notice, beyond that which was contained in the July 11, 1988 Termination Notice (M-4) (Tr. at 50).

---

**3.** The court here notes that its employment of the term "Workout Arrangement" throughout this opinion bears no legal significance whatsoever. Rather, it is used merely to distinguish the August 3, 1988 letter from DIAF to the debtor from the various other correspondences between the parties hereto.

On October 6, 1988, DIAF transmitted a letter to the debtor entitled "Notice to Cure" (M–7). This letter stated that the debtor was in default to the extent of $13,508.28 of its financial obligations under the Licensing Agreement and Workout Arrangement as a result of Tudor's failure to pay the monthly fees due DIAF under Section 8 of the License Agreement. The letter further stated that:

Pursuant to Section 19 of the License Agreement, Licensee has 10 days after receipt of this notice to cure the monetary default, to pay all Monthly Royalties, Reservation System User Fees and other amounts now owed DIAF, including amounts payable under past due Monthly Franchise Reports and to submit any past due Monthly Franchise Reports.

The default will not be cured until DIAF receives payment of the Reservation System User Fees attributable to the periods for which Monthly Franchise Reports are missing.

If the defaults are not cured to DIAF's satisfaction within the stated time, DIAF may consider Licensee's actions to be grounds for enforcing the previously transmitted termination of the authority to operate the Hotel under the Days Inn System License granted in accordance with the terms of the License Agreement. Licensee is advised that in the event of a termination, its obligation to comply with the post-termination provisions imposed by the License Agreement or by law shall remain in full force and effect. DIAF will insist upon strict performance of such obligation and will take action to recover damages incurred by its [sic] as a result of the termination of the License Agreement. Please contact us as soon as possible concerning this default. This matter requires your immediate attention.

(M–7).

On October 14, 1988 John M. Pyecha, Vice President and Controller of DIAF sent a letter to George L. Steen, General Manager of the debtor which stated:

In compliance with the agreement we had today regarding the financial default we are in here at the Days Inn of Cherry Hill, please find enclosed our first payment of four for $2,500.00

Once again I thank you for working with us to overcome this difficulty and you will receive all payments as agreed. i.e. Three additional checks of $2,500.00 each on October 24, October 31, and November 7, 1988.

(M–8). The payment plan set forth in the aforementioned letter envisioned four $2,500.00 payments from Tudor to DIAF, for four consecutive weeks (i.e., October 14, 1988, October 24, 1988, October 31, 1988 and November 7, 1988) (*See* M–8). According to Buckberg, the purpose of this letter was to resolve the defaults complained of in the "Notice to Cure" letter of October 6, 1988 (M–7) (Tr. at 55). Buckberg testified that (1) the debtor did not make the payments agreed to in the Workout Arrangement (M–6) or the letter of October 18, 1988 (M–8) (T1 at 55–56); (2) there was approximately $27,900.00 owed to DIAF by Tudor at the time the bankruptcy petition was filed on October 28, 1988, which includes amounts the debtor agreed to pay as a condition of reinstatement set forth in the Workout Arrangement (M–6) (T1 at 56); and (3) condition 5 of the Workout Arrangement was never met by the debtor [4] (Tr. at 56).

Buckberg further testified that the debtor failed to meet condition 2 or 4 of the Workout Arrangement (M–6) (Tr. at 57–60).[5] With respect to the construction re-

---

[4] This provision of the Workout Arrangement provided:

5. During the 60 day renovation period, the Hotel will be operated in accordance with the License Agreement, and Licensee will make all payments required under the License Agreement as and when due. DIAF will continue Reservation System service for the Hotel unless Licensee defaults under the terms of the License Agreement and fails to cure such default within the time permitted thereunder.

[5] These provisions provided respectively:

2. Licensee renovates and improves the Hotel to the point where it scores at least 425 on a DIAF quality assurance inspection. These improvements should include the items

quirements set forth in condition 2, Buckberg testified that DIAF never agreed to extend the time within which the 300 building was to be rennovated and improved, beyond that time set forth in condition 2 which construction was to be completed by November 4, 1988. With respect to the signage requirements set forth in condition 4, Buckberg explained that the October 10, 1988 quality assurance inspection triggered the 15 day sign requirement and that the Days Inn signs should have therefore been installed by October 25, 1988 (Tr. at 57–58). According to Buckberg, Tudor had not ordered the signs as of October 20, 1988 (*See* M–9 *infra*) (Tr. at 59), despite the fact that the construction permit for the signs was issued by the Cherry Hill Department of Code Enforcement on or about February 29, 1988, eight months after the License Agreement was executed (Tr. at 45).

On October 20, 1988, Charles G. Resnick transmitted a letter to DIAF on behalf of Tudor Motor Lodge (M–9) in order to update DIAF on Tudor's status with respect to the Workout Arrangement. Resnick addressed each of the five conditions set forth in the Workout Arrangement and advised as follows:

1. This financial default has been cured. Apparently a new default letter has been sent which has resulted in negotiations to establish that some of the items listed on the DIAF statement as due were in fact not due and the remaining amount, approximately $10,000, has been resolved as per the enclosed letter dated October 14, 1988 sent to Mr. John M. Pyecha of your organization.

2. A QA inspection was conducted on October 10, 1988 at which time a score of 433 was achieved in satisfaction of this requirement. The soffits were completed prior to the time of this inspection. 300 Building has not yet been completed although my client is continuing to "work diligently," as required by your letter, on this problem. I will elaborate later on that.

3. George Steen has completed the required training program. Enclosed find photocopy of DIAF message to that effect. '

4. The signage cannot be installed by October 25 as it will take more time than that to manufacture, deliver and install the sign once it is ordered. I will discuss that further below.

5. This has been complied with.

(M–9). Joel Buckberg testified that upon receipt of this letter from the debtor, DIAF was in a position to issue notice of termination pursuant to the Workout Arrangement (M–6) to the Tudor Motor Lodge (Tr. at 79). According to Buckberg, shortly after DIAF received Resnick's letter of October 20, 1988 (M–9), he was advised that Tudor was filing a Chapter 11 bankruptcy petition (Tr. at 60–61). Buckberg explained that, upon advice of counsel and in view of the Bankruptcy Code's automatic stay, DIAF did not give notice of termination to Tudor (Tr. at 61 and 79), nor did DIAF remove the debtor from the Days Inn reservation system (Tr. at 61). Days Inn also continued to conduct quality assurance inspections on Tudor's property (T1 at 61).

On February 8, 1989 DIAF filed the instant motion for relief from the automatic

---

listed on the attachment to the July 22 letter, to the extent feasible, and those items listed under the Marginal section of the July 8 inspection report attached to the July 22 letter, provided that Licensee will be required only to continue working diligently on the "300 building" and such building will not be considered as part of the inspection to determine whether Licensee has met the 425 score requirement. These renovations must be completed on or before October 4, 1988. During the period of renovation, the 300 building must be taken out of service and repaired and renovated to achieve a minimum score of 425 and meet Days Inn System Standards. Such

repairs and renovations on the 300 building must be completed within 90 days. Licensee will also be afforded 90 days to complete scraping and painting of soffits.

4. Licensee will complete installation of Days Inn System signage for the Hotel conforming to applicable System Standards within 15 days after receiving the 425 quality assurance inspection score. Such installations will conform to the installation proposed on the attachment hereto. DIAF will be obligated to provide no sign allowance or other monetary compensation or incentive to the Licensee with respect to the signage.

stay pursuant to 11 U.S.C. § 362(d)(1) and Bankruptcy Rule 9014. DIAF alleges that prior to the filing of the debtor's bankruptcy petition, debtor had failed to comply with the signage requirements under the License Agreement and the Workout Arrangement. DIAF further alleges that the debtor is in default with respect to royalty payments and other expenses due and owing DIAF and relies upon an itemized statement of pre-petition indebtedness owed to DIAF by the debtor which indicates a total amount due of $27,956.56 (M–10). DIAF's position is that the Termination Notice of July 11, 1988 (M–4) sufficed to terminate Tudor's Days Inn License; that the Workout Arrangement dated August 3, 1988 merely delayed termination and that the debtor's failure to comply with the conditions set forth in the Workout Arrangement prohibits reinstatement of the License. According to DIAF, the debtor's Days Inn license was terminated prepetition and remained terminated on the date of the filing of the petition, October 28, 1988, and therefore is not property of the debtor's estate under 11 U.S.C. § 541, and cannot be assumed as an executory agreement under 11 U.S.C. § 365. DIAF further argues that at the time the petition was filed the debtor had no contract right to reverse the termination, and specifically that the right to cure the sign default expired pre-petition on October 25, 1988, and the debtor's time to cure the construction defaults expired post-petition on November 4, 1988, and the debtor's time to cure the financial defaults expired on November 7, 1988. In the alternative, DIAF's position is that, assuming *arguendo* that the court determines that the License Agreement was not terminated and that the License is property of the debtor's estate, DIAF's motion for relief from the stay should not fail because the debtor has failed to meet the burden of proof on the issue of adequate protection within the meaning of 11 U.S.C. § 362(d)(1).

On March 6, 1989 the debtor filed opposition papers to DIAF's motion for relief from the stay. The debtor's position is that since becoming a Days Inn system licensee, it has remained in substantial compliance with the License Agreement in that it has maintained passing scores for its quality assurance inspections. Specifically, the debtor contends that it passed the initial 1987 inspection and obtained the following results during subsequent quality assurance inspections: (1) February 1, 1988 inspection—obtaining a passing score of 413 when the required passing score was 370 (D–1); (2) July 8, 1988 inspection—obtained a quality assurance inspection score of 402 (D–2) when it was required to obtain a score of 425 but obtained such a passing score of 433 (D–3) on October 10, 1988 when the inspection deadline was extended; and (3) February 9, 1989 inspection—obtaining a passing score of 370. (*See* Reply In Opposition to DIAF's Motion From the Automatic Stay at ¶ 13) (hereinafter "Debtor's Reply at ¶ _____").

With respect to DIAF's allegations that the debtor has failed to meet sign requirements, the debtor admits that, as of the October 28, 1988 petition date, the debtor had not erected permanent Days Inn signs (Debtor's Reply at ¶ 10). The debtor asserts that it experienced delay in the erection of signs for the front and back of its facility due to initial problems requiring changes to sign posts, delay in obtaining a construction permit and ultimately, cash flow problems. (*See* Debtor's Memorandum of Law in Opposition to DIAF's Motion at page 2) (hereinafter "Debtor's Memorandum at _____"). According to the debtor, the cost of obtaining an approved sign initially ranged from approximately $3,000.00 to $9,752.00 as of June 29, 1988. (*See* Debtor's Memorandum at p. 2).

The debtor further asserts that it has complied with each of the five requirements set forth in the Workout Arrangement letter dated August 3, 1988, except for the requirement regarding sign installation. (*See* Debtor's Memorandum at p. 3). It is the debtor's position that it remains a participating licensee in the Days Inn System since it has yet to receive the termination notice required by DIAF's August 3, 1988 Workout Arrangement which provided for reinstating the debtor in the Days Inn System (*See* Debtor's Reply at ¶ 16).

In this regard the debtor relies upon the first full paragraph (set forth after the five conditions) on page 2 of the August 3, 1988 letter (M–6) which states in relevant part: "If Licensee fails to complete the items set forth above and satisfy the conditions of this letter, the termination will become immediately effective upon notice from DIAF." The debtor's position is that the terms of the Workout Arrangement required DIAF to send notice of termination for failure to meet the conditions set forth therein, which it asserts DIAF never did. According to the debtor, such termination notice is also required by N.J.S.A. 56:10–5.[6] (*See* Debtor's Reply at ¶ 16). In addition, the debtor contends that the August 3, 1988 letter modified DIAF's July 11, 1988 Notice of Termination and in effect rescinded such notice. (Debtor's Memorandum at 2–3).

The debtor admits that it was indebted to DIAF for prepetition franchise fees and services in the amount of $25,968.02, as set forth on its Schedule of Creditors. (Debtor's Reply at ¶ 10). The debtor, however, denies DIAF's allegation that it is indebted to DIAF for any postpetition liabilities and contends all liabilities incurred subsequent to October 28, 1988 to DIAF have been timely paid. (Debtor's Reply at ¶ 10). According to the debtor, for the months of November and December, 1988, and January, 1989, debtor paid its liabilities to DIAF in the respective amounts of $5,790.51, $9,383.09 and $4,308.58, totaling $19,482.18 (Debtor's Reply at ¶ 10). The debtor further asserts that it will also be paying

DIAF liabilities incurred during the month of February 1989 (Debtor's Reply at ¶ 10).

The debtor asserts that it is the debtor's intention to submit a reorganization plan that will enable it to continue operations until it can obtain a purchaser for the going concern value of its property at a price that will be in the best interest of DIAF and all creditors. (Debtor's Reply at ¶ 20). In this regard, the debtor contends that it continues to participate in the Days Inn Reservation System with the full authorization and permission of DIAF (Debtor's Reply at ¶ 14), that DIAF continues to regard the debtor as a participating licensee (Debtor's Reply at ¶ 15), that as of the October 28, 1988 petition date the debtor continued to have rights as a licensee (Debtor's Reply at ¶ 17), that its license is a valuable property right of the debtor's estate pursuant to 11 U.S.C. § 541 (Debtor's Reply at ¶ 18), and that the revenue generated by the debtor by virtue of its status as a licensee under the Days Inn System is essential to the success of the debtor's reorganization. (Debtor's Memorandum at 4).

The debtor further contends that DIAF's interests are adequately protected within the meaning of 11 U.S.C. § 362(d)(1) inasmuch as DIAF is presently being paid for all post-petition liabilities, the debtor has passed the required quality assurance inspections, and DIAF will receive payment on prepetition liabilities upon the successful completion of the debtor's reorganization (Debtor's Reply at ¶ 21).

The debtor's legal argument as set forth in its "Supplemental Brief in Opposition to

---

6. N.J.S.A. 56:10–5 provides:

Termination of franchise; notice; grounds

It shall be a violation of this act for any franchisor directly or indirectly through any officer, agent, or employee to terminate, cancel, or fail to renew a franchise without having first given written notice setting forth all the reasons for such termination, cancellation, or intent not to renew to the franchisee at least 60 days in advance of such termination, cancellation, or failure to renew, except (1) where the alleged grounds are voluntary abandonment by the franchisee of the franchise relationship in which event the aforementioned written notice may be given 15 days in advance of such termination, cancellation, or failure to renew; and (2) where

the alleged grounds are the conviction of the franchisee in a court of competent jurisdiction of an indictable offense directly related to the business conducted pursuant to the franchise in which event the aforementioned termination, cancellation or failure to renew may be effective immediately upon the delivery and receipt of written notice of same at any time following the aforementioned conviction. It shall be a violation of this act for a franchisor to terminate, cancel or fail to renew a franchise without good cause. For the purposes of this act, good cause for terminating, canceling, or failing to renew a franchise shall be limited to failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise.

**948**

Motion of Days Inn Franchising, Inc. for Relief from Automatic Stay", filed with the court on March 22, 1989, is that: (1) DIAF did not issue an effective termination notice in compliance with N.J.S.A. § 56:10–5; (2) DIAF is estopped from claiming that any vitality remains in the July 11, 1988 termination notice because it was superceded by the August 3, 1988 letter; and (3) the License Agreement between the debtor and DIAF was in effect on the petition date of October 28, 1988 and was not the subject of automatic termination without further action on the part of DIAF, and accordingly the debtor's license became part of the debtor's estate pursuant to 11 U.S.C. § 541.

On March 22, 1989, Midlantic National Bank/South, a major creditor of Tudor Motor Lodge, submitted a brief in opposition to DIAF's motion for relief from the stay, wherein Midlantic set forth the following legal arguments. First, that the automatic stay is applicable to the actions of DIAF since the debtor's rights under the License Agreement are property of the estate. Second, that the License Agreement was not validly terminated prior to the filing of the bankruptcy petition on October 28, 1988 and the debtor's License is therefore property of the estate subject to the automatic stay. The rationale underlying this argument is that the expiration of the License Agreement did not involve an expiration pursuant to the Agreement's terms; termination of the License Agreement pursuant to notice given by DIAF to the debtor prior to the filing date required further action of DIAF; and termination of the License Agreement required further action by DIAF pursuant to the August 3, 1988 Workout Arrangement and the subsequent cure period agreed upon by the parties by letter dated October 6, 1988 and October 18, 1988, which cure period did not have a "drop dead" date but rather contemplated payments at least through November 7, 1988. Midlantic's third legal argument is that the License Agreement at issue was not terminated, was property of the estate and an executory contract assumable by the debtor under 11 U.S.C. § 365 and pursuant to a plan of reorganization.

DISCUSSION

*1. Termination of the License Agreement*

Section 541 of the Bankruptcy Code defines property of the estate and specifies what property becomes property of the estate. The commencement of a bankruptcy case creates an estate comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Although the language of § 541 is broad, Congress clearly did not intend to "expand the debtor's rights against others more than they exist at the commencement of the case." H.R.Rep. No. 595, 95th Cong. 1st Sess. 367 (1977), 1978 U.S.Code Cong. & Ad.News at 5787, 6323. The nature and extent of the debtor's interest in the franchise is determined initially by state law. *Butner v. U.S.,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). The franchisee's contractual rights in a Franchise Agreement are generally considered property of the estate, except where said agreements have been effectively terminated prior to a debtor's filing. *In re Varisco,* 16 B.R. 634, 637 (Bankr.M.D.Fla.1981); *See also Triangle Laboratories, Inc.,* 663 F.2d 463, 467– 68 (3d Cir.1981); *Schokebeton Industries, Inc. v. Schokebeton Products Corp.,* 466 F.2d 171, 176–77 (5th Cir.1972); *Matter of R.S. Pinellas Motel Partnership,* 2 B.R. 113, 116–17 (Bankr.M.D.Fla.1979). Any right created in the estate by a franchise agreement is subject to the automatic stay provisions of § 362 of the Bankruptcy Code. Further, franchise rights which become part of the estate may be viable executory contracts capable of assumption pursuant to § 365(b)(1) of the Code. *Varisco,* 16 B.R. at 637.

The threshold question in this matter is whether, as of October 28, 1988, the date of the commencement of this Chapter 11 case, the debtor's estate included the subject License Agreement or whether the License Agreement terminated prior to the debtor's filing.

The automatic stay does not toll the mere running of time under a contract

and thus has been held not to prevent automatic termination of the contract. *See Moody v. Amoco Oil Company,* 734 F.2d 1200, 1213 (7th Cir.1984), *cert. denied,* 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 321 (1984). The *Moody* case involved in part the attempted termination by Amoco Oil Company of certain retail petroleum dealerships which the debtors operated in the state of Wisconsin. On February 3, 1983 Amoco sent by certified mail to the debtors two separate but substantially identical termination notices based on defaults under the subject leases and the expiration of a prior five-day cure notice which were sent to the debtors by Amoco were to be effective 90 days from the date of the letter. 734 F.2d at 1206. The debtors filed their Chapter 11 petition on February 4, 1983. The Seventh Circuit found that the termination notices were effective on February 3, 1983 when they were mailed, before the debtors filed for bankruptcy. 734 F.2d at 1212. The court further found that the subject contract gave the debtors no right to cure once the termination notices were mailed, that Wisconsin law gave the debtors no right to cure and that Amoco did not have to take any further action to terminate the contracts but that termination was automatic at the end of the 90 days. *Id.*

In so ruling, the *Moody* court set forth the following analysis:

Section 365 of the Code only gives a debtor the right to assume an executory contract. If a contract has been terminated pre-bankruptcy, there is nothing left for the debtor to assume. However, the termination must be complete and not subject to reversal, either under the terms of the contract or under state law. L. King, 2 Collier on Bankruptcy ¶ 365.03 (15th ed. 1979); *see In re Fontainebleau Hotel Corp.,* 515 F.2d 913 (5th Cir.1975).

\* \* \* \* \* \*

The fact that the termination itself was not effective for ninety days does not affect the result. The filing of the chapter 11 petition cannot expand debtors' rights as against Amoco. *Schokbeton Industries, Inc. v. Schokbeton Products Corp.,* 466 F.2d 171, 176–77 (5th Cir.1972); *see Kopelman v. Halvajian (In re Triangle Laboratories, Inc.),* 663 F.2d 463, 467–68 (3d Cir.1981). When the termination notice was sent, debtors only had a right to ninety days' worth of dealership contracts. The filing of the petition does not expand that right. This conclusion is supported by a number of decisions in the bankruptcy courts. *See e.g., New Media Irjax v. D.C. Comics,* 19 B.R. 199 (Bkrtcy.M.D.Fla.1982); *In re Benrus Watch Co.,* 13 B.R. 331 (Bkrtcy. S.D.N.Y.1981); *In re Beck,* 5 B.R. 169 (Bkrtcy.D.Haw.1980).

Similarly, section 541(a) provides that a debtor's estate consists of "all legal or equitable interests of the debtor in property as of the commencement of a case." Thus whatever rights a debtor has in property at the commencement of the case continue in bankruptcy—no more, no less. Section 541 "is not intended to expand the debtor's rights against others more than they exist at the commencement of the case." H.R.Rep. No. 595, 95th Cong., 1st Sess., *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787.

Section 362, which creates an automatic stay of certain creditor actions upon the filing of a petition in the bankruptcy court, does not help debtors here. The automatic stay does not toll the mere running of time under a contract, and thus it does not prevent automatic termination of the contract. *See Johnson v. First National Bank of Montevideo,* 719 F.2d 270, 273 (8th Cir.1983), *cert. denied,* 465 U.S. 1012, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984). *See also, e.g., In re Anne Cara Oil Co.,* 32 B.R. 643, 647–48 (Bkrtcy.D.Mass.1983); *In re Nashville White Trucks,* 5 B.R. 112, 117 (Bkrtcy.M. D.Tenn.1980). Section 362 does not give a debtor greater rights in a contract. *Trigg v. United States,* 630 F.2d 1370, 1372 (10th Cir.1980). Thus, debtors cannot rely on section 362 to prevent termination of the contracts.

734 F.2d at 1213.

In so holding, the Seventh Circuit specifically affirmed the factual finding of the district court that Amoco had never explic-

itly or implicitly agreed to a standstill of the cure period, had taken no action to induce the debtors not to cure the subject defaults and that there was no basis to invoke the doctrine of equitable estoppel against Amoco. *Id.* at 1213–14. The debtors also conducted wholesale petroleum operations as an Amoco jobber (jobbership). The jobbership was subject to a separate agreement between the parties. In that same case the debtors argued on appeal that the jobbership contract was assumable by the debtors notwithstanding the fact that prior to the bankruptcy filing a termination notice was sent and received by the debtors based upon the fact that the debtors filed the bankruptcy petition before the expiration of a 15–day cure period allowed by the jobbership termination notice. Amoco argued that Section 108(b)[7] of the Bankruptcy Code controlled and that the debtors would have had to cure the default within 60 days if they wanted to assume the contract. In this regard the *Moody* court found that the agreement was assumable by the debtors under § 365 of the Bankruptcy Code noting:

> Section 108(b) provides in part that where an agreement fixes a time period in which the debtor may cure a default, the debtor may cure before the later of the expiration of the time period or sixty days after the filing of the petition. We hold, however, that section 108(b) does not apply to curing defaults in executory contracts. Section 365 specifically governs the time for curing defaults in executory contracts, and thus, it controls here. *See In re McLouth Steel Corp.*, 20 B.R. 688 (Bkrtcy.E.D.Mich.1982). At the time debtors filed their petition, the time for cure had not expired. The contract was still executory. *See In re East-hampton Sand & Gravel Co.*, 25 B.R. 193, 197 (Bkrtcy.E.D.N.Y.1982). Under

section 365(a), debtors may still elect to assume the contract. If debtors ultimately determine to assume it, they may cure the default at any time prior to the assumption, pursuant to section 365(b)(1)(A).

734 F.2d at 1215 (footnote omitted).

Accordingly, in considering whether a franchise agreement was effectively terminated prior to bankruptcy, courts have considered whether the debtor was granted an opportunity to cure defaults. *See e.g. In re Varisco*, 16 B.R. at 637–38; *In re ERA Central Regional Services, Inc.*, 39 B.R. 738, 740–41 (Bankr.C.D.Ill.1984). "Where a franchisee is granted time to cure defaults and the franchisee files its bankruptcy petition prior to the time the cure period expires, the franchise agreement is not terminated and is part of the estate." *ERA Central*, 39 B.R. at 741.

DIAF's position is that the License Agreement terminated pursuant to the terms of the Termination Notice of July 11, 1988 (M–4), namely, sixty days after the debtor's receipt of that letter. According to DIAF, it agreed to withdraw the termination by and through the Workout Arrangement dated August 3, 1988 (M–6) in the event the debtor met certain specified conditions. DIAF contends that because the condition as to the debtor's cure of its default regarding the sign was not met by the agreed-upon date of October 25, 1988, the termination process was complete prior to the petition date of October 28, 1988.

In contrast, the debtor and Midlantic rely upon the terms of the August 3, 1988 Workout Arrangement and N.J.S.A. 56:10–5 in support of their contention that the cure period did not end on October 28, 1988 but instead continues to remain in effect. The August 3 letter stated in relevant part: "If licensee fails to complete the

---

7. 11 U.S.C. § 108(b) provides:

    (b) Except as provided in subsection (a) of this section, if applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor or an individual protected under section 1201 or 1301 of this title may file any pleading, demand, notice, or proof of claim or loss, cure a default, or perform any other similar act, and such period has not expired before the date of the filing of the petition, the trustee may only file, cure, or perform, as the case may be, before the later of—

    (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

    (2) 60 days after the order for relief.

items set forth above and satisfy the conditions of this letter, the termination will become immediately effective upon notice from DIAF." (M–6). The debtor and Midlantic maintain that because the debtor has not yet received notice of termination from DIAF, neither the cure period nor the Agreement itself have been terminated. The parties also suggest that DIAF has failed to comply with the requirement of N.J.S.A. 56:10–5 of 60 days notice of termination by virtue of the fact that DIAF's August 3 letter (M–6) effectively rescinded DIAF's July 11, 1988 Termination Notice and that DIAF is required to issue another formal notice permitting the debtor 60 additional days notice.

The case of *ERA Central, supra* is factually analogous to the case under consideration. In that case, ERA Central a franchisor, gave 90 days notice of default to a franchisee, and provided that if the defaults were not cured within the 90–day period, the franchise was to immediately and automatically terminate. On the day before the expiration of the cure period, the franchisee filed a chapter 11 bankruptcy petition. The *ERA Central* court held:

> Viewing the notice provisions in their entirety ERA granted to CRS 90 days to "rectify and satisfy" or to "cure" its defaults. The court concludes that the agreements could not terminate until after the cure period expired. In this case debtor filed its petition in bankruptcy one day prior to the expiration of the cure period, and, as such, the Agreements were not terminated when debtor filed for bankruptcy. Debtor's Agreements are property of the estate, and, as property of the estate, the Agreements are subject to the automatic stay in bankruptcy. The automatic stay prohibited the Agreements from terminating without court approval. *Matter of R.S. Pi-*

*nellas Motel Partnership,* 2 B.R. 113, 117–9 (Bkrtcy.M.D.Fla.1979).

39 B.R. at 741.

■ This court finds that the terms of the August 3, 1988 Workout Arrangement (M–6) define the nature and extent of the parties' present relationship. DIAF extended the effectiveness of any termination by its August 3, 1988 letter. Subsequently, a cure period in connection with the debtor's financial obligations under the License Agreement was agreed upon by the parties as evidenced by the October 6, 1988 and October 14, 1988 letters. (M–7; M–8). This cure period did not have a "drop-dead" date and, in fact, contemplated payments at least through November 7, 1988. Additionally, according to Buckberg's own testimony, the debtor's construction obligations in connection with the "300" building was to be completed by November 4, 1988, after the date the Chapter 11 petition was filed. Furthermore, DIAF was required to give further notice of termination and did not do so prior to the petition date because the cure period was still in effect. Just as in *ERA Central Regional Services, Inc.,* the debtor filed a bankruptcy petition during the interim cure period. Accordingly, as of the filing date the debtor's rights under the License Agreement were property of the estate, subject to the automatic stay of § 362 and potentially assumable as an executory contract pursuant to § 365 of the Bankruptcy Code.[8]

Based upon this finding, the court declines to address the issue raised by the debtor and Midlantic that N.J.S.A. 56:10–5 requires DIAF to extend to the debtor an additional 60 days notice of termination.

### 2. Relief from the Automatic Stay

■ The fact that the automatic stay suspends termination of the License Agreement does not prevent termination indefinitely. Title 11 U.S.C. § 362(d) of the Bankruptcy Code provides:

---

8. The court here notes that to the extent there is a conflict between the specific sections of §§ 362, 365 and 105, and the general provision of § 108 (which provides for a 60 day limitation on cure periods), the specific provisions prevail. "Section 108(b) does not apply to curing de-

faults in executory contracts. Section 365 specifically governs the time for curing defaults in executory contracts, and thus, it controls here." *Moody v. Amoco Oil Co., supra,* 734 F.2d at 1215 (citation omitted).

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

> (1) for cause, including the lack of adequate protection of an interest in property under subsection (a) of this section of such party in interest; or
>
> (2) with respect to a stay of an act against property, if—
>
> (A) the debtor does not have an equity in such property; and
>
> (B) such property is not necessary to an effective reorganization.

In seeking relief from the automatic stay, the moving party has the burden of proof on the issue of the debtor's equity in the collateral, with the debtor having the burden of proof on all other issues, including adequate protection. 11 U.S.C. § 362(g).

In this case DIAF relies upon subsection (1) of § 362(d) to support its position that even if the License Agreement was property of the estate, the debtor has not met its burden of proof on the issue of adequate protection.

The debtor in this case submitted a memorandum of law in opposition to DIAF's motion for relief from the stay which stated:

> 2. *Movant's interests in the license rights are adequately protected.*
>
> At this point in time, in order to obtain relief from the Automatic Stay, Movant must demonstrate that its interests are not "adequately protected." Bankruptcy Code Section 362(d). DIAF is not a secured creditor. It does not have a property interest in the Debtor the value of which is eroding during the pendency of the Chapter 11 proceeding. The Debtor

has paid all obligations and liabilities owing to DIAF since the petition date.

> The Debtor recognizes that the trademark of Days Inns of America Franchising, Inc. is of value to not only the Debtor but to the Movant and its licensees as well. The Debtor has maintained the Quality Assurance inspection standards of its facility and has not tarnished nor diminished the trademark value of Movant by failure to meet required inspection standards.

(Debtor's Brief filed March 6, 1989 at pp. 6–7). It is the debtor's position that it has until the confirmation of its plan to assume the License Agreement with DIAF as an executory contract pursuant to § 365 and that when it seeks such assumption, it will then provide adequate assurance to DIAF pursuant to § 365.[9] Midlantic concurs in this position and argues further that the 60 day limitation on the cure period under § 108(b) does not apply to curing defaults in executory contracts and that the time for curing defaults is governed by § 365. Section 108(b) of the Bankruptcy Code provides:

> (b) Except as provided in subsection (a) of this section, if applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixed a period within which the debtor or an individual protected under section 1201 or 1301 of this title may file any pleading, demand, notice, or proof of claim or loss, cure a default, or perform any other similar act, and such period has not expired before the date of the filing of the petition, the trustee may only file, cure, or perform, as the case may be, before the later of—
>
> (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

---

9. 11 U.S.C. § 365(b)(1) provides:

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

(2) 60 days after the order for relief.

In this regard, Midlantic relies on the *Moody* case which discusses the policies underlying the different statutory provisions and the Code in general as follows:

> The purpose behind section 108(b) is to permit the debtor an extension of time for doing certain acts necessary to preserve his rights. It would be anomalous to apply it to restrict debtors' rights, as Amoco would have us do here. Applying section 108(b) here would force debtors to decide whether to cure long before they must decide whether to assume or reject the contract and long before they know whether any reorganization plan will be confirmed. Finally, the purpose behind chapter 11 is "to permit successful rehabilitation of debtors" and "to prevent a debtor from going into liquidation." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984). Debtors must be permitted a certain amount of flexibility in determining whether to assume or to reject a contract. Specific provisions of the Code should be interpreted with this goal in mind. To interpret the Code so as to minimize flexibility and rush the debtor into what may be an improvident decision does not further the purposes of the reorganization provisions.

*Moody v. Amoco Oil Co., supra,* 734 F.2d at 1216.

Section 361 provides:

> When adequate protection is required under section 362, 363 or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—
>
> > (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
> >
> > (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or
> >
> > (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.

Although the concept of adequate protection is intended to protect a creditor's interest in the collateral, it is susceptible to differing applications over a wide range of factual situations. The House Report states that adequate protection:

> is not intended to be confined strictly to the constitutional protection required, however. The section, and the concept of adequate protection, is based as much on policy grounds as on constitutional grounds. Secured creditors should not be deprived of the benefit of their bargain. There may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the bankruptcy laws. Thus, this section recognizes the availability of alternate means of protecting a secured creditor's interests. Though the creditor might not receive his bargain in kind, the purpose of the section is to insure that the secured creditor receives in value essentially what he bargained for.

H.R.Rep. No. 595 at 339, 1978 U.S.Code Cong. & Ad.News at 5787, 6295.

In recognizing the elasticity of adequate protection in the § 362(d) context, one noted bankruptcy commentator has explained:

> Section 361 consists merely of examples of adequate protection given to illustrate possible approaches to commonly recurring problems. The drafting indicates a primary concern with entities holding liens on property since secured creditor problems are the most frequently litigated. However, other parties, such as cosignors, lessors, and co-owners are also entitled to demand adequate pro-

tection of their interest in the debtor's property. In any of those situations adequate protection is a flexible concept and can lead to the imposition of other duties or conditions to continuance of the automatic stay which are not directly related to the examples in section 361.

*Collier on Bankruptcy* ¶ 362.07 at 362–54 (footnote and citations omitted).

■ On a motion for relief from the stay, adequate protection is meant to preserve the status quo of the entity with an interest in the debtor's property during a reasonable length of time. The rights of the creditor are frozen, but not changed. *In re Chevy Derco*, 78 B.R. 585, 588 (Bankr.C.D.Calif.1987).

■ Adequate protection in the context of relief from the automatic stay is clearly a flexible concept which requires a court to make decisions on a case-by-case basis after full consideration of peculiar characteristics common to each proceeding. *In re Monroe Park*, 17 B.R. 934 (D.Del. 1982) (citations omitted). As a court of equity, this court may consider the consequences of the stay on the parties and the "balance of hurt" in tailoring relief appropriate for the factual scenario. *Id.* at 941; *see also Collier on Bankruptcy, supra,* at 362–61. The sole duty of the bankruptcy court, however, in a § 362 proceeding is to pass upon the debtor's proposed form of adequate protection. *Id.* The responsibility of proposing a method of protection is reserved exclusively for the debtor. *Id.,* *citing* H.R.Rep. No. 595, 95th Cong., 1st Sess., *reprinted in* [1978] U.S.Code Cong. & Adm.News 5787, 6295. If a debtor asserts certain means of adequate protection and fails to support these means with competent evidence, the bankruptcy court may permissibly lift the stay without further explanation of any viable alternatives. *Id.* (citations omitted).

■ In the case of *B–K of Kansas, Inc.,* 69 B.R. 812 (Bankr.D.Kan.1987), the bankruptcy court analyzed, *inter alia,* the adequate protection issue under 11 U.S.C. § 362(d)(1) in the context of a franchise agreement between the debtor and Burger King Corporation. There the court concluded:

> The Court also grants relief from the stay "for cause, including the lack of adequate protection ..." 11 U.S.C. § 362(d)(1).
>
> First, Burger King Corporation is not adequately protected in this case. The debtors have continued to use the trademarks and service marks without paying Burger King Corporation. The arrearages on royalties and advertising are accumulating at an enormous rate. *Furthermore, the property in this case, the use of trademarks and service marks, is of such a type that money may never adequately protect the movant. The movant's reputation to the general public is at stake.*

*B–K of Kansas,* 69 B.R. at 815 (emphasis added). While the *B–K of Kansas* case is factually distinguishable from the case *sub judice* since the debtor therein failed to pay royalties and advertising fees after the petition was filed, unlike the debtor Tudor Motor Lodge, it is relevant to this analysis in that it recognizes the value of a franchisor's trademark, service marks and reputation to the general public. Days Inn employs a quality assurance system in order to protect these highly valuable, though intangible, commodities. In the case of *In re Gainesville P–H Properties, Inc.,* 77 B.R. 285, 289 (Bankr.M.D.Fla. 1987), the court discussed the relationship between trade/service marks and the Days Inn quality assurance system with an eye toward determining the reasonableness of that system. The court noted that:

> Days Inns, at great expense over a period of years, has developed a distinctive trade dress which it has marketed and promoted to the public in order to develop a public awareness and association with Days Inns facilities and related products and services. There is a general public awareness and association of the combination of the substantially standardized, recognizable and unique elements of a Days Inn facility among its customers and its potential customers in the geographical area where Days Inns facilities are located. The various ser-

vice marks and the trade dress of Days Inns constitute an asset and good will of substantial value and are a symbol of Days Inns, its motels and services.

\*   \*   \*   \*   \*   \*

Among the terms and conditions that GPHP agreed to perform under the franchise agreements was to maintain and operate the facilities and their related services in conformity with Days Inns' standards, methods and procedures and to make such repairs and replacement to the facilities as Days Inns may require to insure an acceptable degree of quality, service and image of Days Inns and to protect its name and good will throughout the term of the franchise agreements.

As a franchisee, GPHP was required to comply with Days Inns Quality Assurance ("Q.A.") program, which provides, among other things, certain standards and specifications regarding the conditions of buildings, fixtures and furnishings, housekeeping and operation procedures and other matters designed to assure a uniform and standardized degree of quality and image available to customers at Days Inns' facilities. Over the years there have been modifications and changes to the Q.A. program as Days Inns deemed appropriate to protect and enhance its image and reputation among its customers in the competitive and evolving motel business.

*Id.* at 288.

The court agrees that DIAF's fundamental mechanism for protecting its reputation and name is the quality assurance system. Through franchise compliance DIAF ensures avoidance of unsatisfactory guest experience. *See Id.* at 292. The court recognizes that DIAF's reputation and name are the basis of the bargain between DIAF and Tudor Motor Lodge. Upon execution of the License Agreement Tudor obtained the benefits of a recognized name in the hotel industry, goodwill, methods of doing business, and a built-in reservation system. At the same time, however, the debtor obtained the burdens of compliance with the Days Inn System. This exchange is the

"essence of the franchise relationship." *Id.*

At the hearing on this matter of March 13, 1989, Buckberg testified that in his view it was important that there be consistency and continuity from licensee to licensee regarding Days Inns' quality assurance program so that the public have an expectation of consistency of service among the approximately 600 Days Inns properties. (Tr. at 20–21; 25–26). Buckberg also testified that the Days Inn "sunburst logo" is a mark and entitlement associated with the Days Inns System by the public and is intended to represent standardized services of consistent quality throughout the United States. (Tr. at 16–18). Buckberg also testified that the sign requirement was of particular importance to the subject property because it is situated on Route 70 in Cherry Hill, in such a way that all of its facilities are not readily visible from the highway so that a high rise sign is critical to attracting people for walk-in trade and for identifying the location for people who have reservations. (Tr. at 37–38). Buckberg further testified that DIAF will continue to suffer harm in the form of an adverse impact on the goodwill of its marks as a result of the debtor's failure to meet the signage requirement resulting in a lack of identification and as a result of the present condition of the 300 building. (Tr. at 62).

Susan Christine Bagby, a quality assurance representative for DIAF, also testified on behalf of the movant. Ms. Bagby explained the "point system" utilized by DIAF in their on-site inspections. A franchisee can score an A, B, C, or F; A indicating a score of 450–500; B is 400–449; C is 370 to 399; and F is a score under 370 (Tr. at 82). The last quality assurance inspection of the debtor's hotel took place on February 9, 1989 at which time Bagby spent 4½ hours at the debtor's premises preparing a quality assurance inspection (M–11) on which Tudor Motor Lodge scored a 370 or C. The court notes that this report did not include the interior of the 300 building because it is an empty building (Tr. at 83–84, 94). Bagby's "Summary

Notes", attached to and made part of the report, cited several warnings to the debtor including:

*Inn Rooms Inspection:* 214, 221, 103, 108, 118, 116, 419, 414, 406, 422, 427, 436, 505, 515, 536, 528 (Only 93 rooms available to rent at present time. Building #3 blocked for renovations which house exactly twenty rooms).

*Item #1 Warning:* D.I.A. requires approved signage to denote each property's location and franchise. Install Days Inn registered trademark signage.

*Item #2 Women's Gym in Spa:* R.O. Commode, p. peeling stallwall, s. carpet, s. ceiling tiles.

*Item #3 Warning:* D.I.A. requires all general managers to attend one manager's forum each year.

*Item #8 Warning:* D.I.A. prohibits advertising services on property which are actually unavailable to the guest. Current directory advertises an ice cream parlor, pizza parlor and 120 guest rooms which are not available at this time.

(M-11). It is noteworthy that Tudor's quality assurance score from the February 1989 inspection dropped 63 points since its inspection in October 1988, just 4 months prior when the debtor scored 433 (Tr. at 94). It is further worth noting that the debtor's score as of February 1989 was just one point above a failing grade.

On July 8, 1988, DIAF took several photographs of the debtor's premises, which were offered into evidence at the hearing. The photographs depict damage to the 300 building (M-3c); construction debris and a general state of disrepair of the 300 building (M-3(e), M-3(f), M-3(b), M-3(c)). (*See* Tr. at 84–89). Bagby testified that the conditions of the premises in these photos which were taken July 8, 1988, had not improved as of the hearing date (Tr. at 88).

Bagby expressed the opinion that the 300 building had to be totally refurbished in order to bring it up to DIAF standards (Tr. at 89) and that it was impossible for the debtor to achieve a passing score if inspection included both the interior and exterior of building 300 (T at 90). The witness estimated that it would cost Tudor at least $150,000.00 to maintain a passing status for the next quality assurance inspection (Tr. at 93).

Bagby further expressed concern over the safety issues raised by the foregoing conditions, especially the severely cracked paving in the passageway areas (Tr. at 90); the unsafe condition of the bathrooms where cracked tiles were identified; and the severely corroded state of certain railings (Tr. at 91). According to Bagby, these areas are a common source of occupancy to patrons (Tr. at 91). Bagby expressed particular concern for senior citizens that use the Days Inn system and which group composes a significant portion of DIAF's business through the "September Days Club" (Tr. at 91–92).

As of the date of the hearing, the debtor had failed to comply with the signage requirements or construction requirements set forth in the License Agreement executed in June of 1987. Photograph M-3a depicts the Tudor Motor Lodge's own sign with a banner draped over it, which banner displays the Days Inn sunburst logo. Because the banner is disproportionately smaller than the sign already standing at the Route 70 entrance to the property, the name of the apparently former occupant of the premises is visible.

George L. Steen, the general manager of the Tudor Motor Lodge, whose duties include overseeing operations, testified that royalties as of February 28, 1989 had been paid to DIAF prior to the March 13, 1989 hearing date, and that the debtor has remained current on all monthly payments to DIAF since the filing of its petition on October 28, 1988 (Tr. at 100). Steen further stated that in 1988, the number of reservations generated by the DIAF reservation system generated approximately $400,000.00 in gross sales for the debtor against costs of approximately $110,000.00, which amount constitutes approximately 40% of Tudor's total sales (T at 101–04).

Based upon the record before this court, the court grants DIAF's motion for relief from the automatic stay on the grounds that the debtor has failed to meet its burden of proving adequate protection. *See* 11

U.S.C. § 362(g). The debtor's offer of adequate protection in the form of payment of post-petition obligations, with payment on pre-petition liabilities upon the successful completion of the debtor's reorganization plan is not adequate. To this day the debtor has not met its signage obligations or performed the construction work it agreed to do initially to bring the premises into compliance with DIAF's standards. All of this has caused DIAF to modify and compromise the Days Inn standards. The court finds that these defaults constitute material breaches of the License Agreement. At a threshold level, these practices diminish the value of DIAF's marks and entitlements, adversely impact patron identification with the system's standardized services and consistent quality, reflect negatively on DIAF's other franchisees, and affects DIAF's royalties from the debtor. In addition, the foregoing would tend to render suspect any claim by the debtor that it could in fact "promptly cure" its defaults within the meaning of 11 U.S.C. § 365. In this regard the court notes that "the property in this case, the use of trademarks and service marks, is of such a type that money may never adequately protect the movant. The movant's reputation to the general public is at stake." B–K of Kansas, 69 B.R. at 815. The court cannot on this record justify subjecting DIAF to additional harm during an indefinite period of time while the debtor determines whether to assume the agreement at stake.

This court rejects the debtor's reliance on the cases of In re Babylon Ltd. Partnership, 76 B.R. 270 (Bankr.S.D.N.Y.1967) and In re Coors of North Mississippi, 27 B.R. 918 (Bankr.N.D.Miss.1983) in support of its position that it need not demonstrate adequate protection until it requests permission to assume the License Agreement which could occur at any time prior to confirmation of its plan. Initially, both the Babylon and Coors cases address the issue of assuming an executory contract pursuant to § 365 only; they do not review the question of relief from the automatic stay. While the Coors court found that the debtor's proposed cure of defaults under a distributorship agreement within three years met the statutory requirement of a "prompt cure" or "adequate assurance of a prompt cure" within the meaning of § 365(b), it also found that the distributor was guilty of unclean hands and actually contributed to the debtor's need for a longer time to cure the defaults at issue in that case. Id. at 922. Similarly, in Babylon, the court noted that the general partner of the debtor and an investor in that general partnership actually contributed funds to save the executory lease at issue in that case. Id. at 275. The debtor has made no such showing. Most significantly, these cases did not raise the issue of adequate protection as it relates to the trade and service marks of a franchisor. The court cannot permit the debtor to continue its substandard operations at the expense of the DIAF and all other Days Inn franchisees.

The court further rejects Midlantic's reliance upon the Moody case. Like Babylon and Coors, the Moody court addressed the issue of assumption of a contract only, not the automatic stay issue. The Moody court's finding that debtor's must be afforded a certain amount of flexibility in determining whether to assume or reject an executory contract does not stand for the proposition that a party in interest is precluded from seeking relief from the stay. Even the Moody court recognized that its holding did not leave the nondebtor party to the contract without a remedy until the confirmation of the debtor's plan. "A party who cannot afford the uncertainty during the pendency of the reorganization may request the bankruptcy court to order the debtor to decide whether to assume or reject the contract within a specified period. 11 U.S.C. § 365(d)(2)." Moody, 734 F.2d at 1216.

The debtor in this case has failed entirely to propose a method for adequately protecting DIAF's interest in the property at stake during the time it would determine whether to assume or reject the License Agreement. Having fully considered the particular facts of this case, the court finds that the debtor has failed to meet its burden of proof on the issue of adequate pro-

tection. Based upon the foregoing, DIAF's motion to lift the automatic stay to complete the termination process of the subject License Agreement is granted. In this regard, DIAF in its letter brief dated March 21, 1989 filed with this court on March 22, 1989, stated:

> If the Court grants Days Inns' application, Days Inns is willing to provide the debtor with a 60 day period to obtain a new licensor or to make arrangements to operate the property under its own name.

(See Letter Memorandum at p. 6, f.n. 4.). This offer will be a condition of the relief that the court grants to DIAF today.

An order shall be submitted in conformance with this opinion.