In the Matter of INDEPENDENT MANAGEMENT ASSOCIATES, INC., a New Jersey Corporation; Consumer Food Services (Maryland), Inc., a New Jersey Corporation; and Consumer Express (Penn) Inc., a Pennsylvania Corporation.

Bankruptcy Nos. 89–02510, 89–02511 and 89–02512.

United States Bankruptcy Court, D. New Jersey.

Dec. 13, 1989.

Jack M. Zackin, Ravin, Greenberg & Zackin, Roseland, N.J., for debtors.

Howard Scher and Jeremy Mishkin, Montgomery, McCrackin, Walker & Rhoads, Philadelphia, Pa., for Burger King Corp.

Lawrence Maher, McKenzie, Welt, Duane, Maher & North, Woodbridge, N.J., for Nat. State Bank.

Allen Gorski, Teich, Groh & Frost, Trenton, N.J., for Creditor's Committee.

## OPINION

WILLIAM H. GINDIN, Bankruptcy Judge.

This matter comes before the court as the result of a motion seeking relief from

the automatic stay brought by Burger King Corporation against the debtors. The debtors, in turn, seek a declaration that they have the right to assume the agreements in order to assign same.

This is a "core" proceeding as defined by 28 U.S.C. § 157(b)(2)(G) and (O).

## FINDINGS OF FACT

1. Burger King is the franchisor of twenty-one certain restaurants of which the debtor, Independent Management Associates, Inc. (IMA), is the franchisee of twelve restaurants, debtor Consumer Food Services (Maryland), Inc. (CFS Maryland) the franchisee of six restaurants and debtor Consumer Express (Penn), Inc. (CE—Penn) the franchisee of three restaurants.

2. The operation of the various franchises is controlled by the franchisor to the extent that requirements for operation, design and color schemes, signage, interior decor, equipment systems, and various other items for operation are carefully controlled and monitored by the franchisor. They are set forth in the Manual of Operating Data (MOD Manual) and the franchisees have acknowledged the existence and the importance of these items.

3. Prior to filing the petitions, the debtors experienced severe cash problems and the statements produced indicated that most of the operations lost money for a substantial period of time prior to the filing of the within petitions. The debtors do not deny these financial problems.

4. The franchisor continually evaluates its franchisees and, beginning with the filing of the petitions herein, the franchisor carefully conducted its inspections and evaluations of quality service and cleanliness. No evidence was adduced that problems were found in inspections made before the filing of the petitions. These reports, known as "QSC" reports, were introduced into evidence and the conditions found were set forth in minute and somewhat graphic detail. The debtors offered no testimony to rebut repeated allegations of improper compliance with the standards. A litany of the various detailed problems noted by the franchisor on the debtor's premises serves no purpose beyond reinforcement of a point which the debtors, by their silence, concede. Suffice it to say that the restaurants involved were neither perfectly clean, perfectly sanitary nor perfectly maintained. There were clear employment and management problems and a number of the facilities did not comply with the terms of the MOD manual.

5. Cross-examination of the witnesses testifying to these difficulties, however, led to the inference that while the problems were serious and not to be minimized, the particular difficulties experienced by the debtors were products as well of the locations of the stores and the particular difficulties experienced in the operations of inner-city facilities. Interestingly enough, the franchisor did not show that the debtors had been cited for violations of local health codes. This court finds that these deficiencies ultimately must be corrected, that the conditions are disturbing, but that the franchisors did not show that they presented an immediate health and safety hazard.

6. On March 24, 1989, Burger King sent notices of default to the debtors for all twenty-one of the facilities. These notices asserted that the debtors had failed to make royalty payments and pay advertising charges due and owing. They did not state that the agreements were in default as a result of failure to live up to the MOD manual. Couched in future terms, they stated that unless the monetary defaults were cured, the contracts "shall" terminate automatically.

7. In addition to franchise charges of approximately $500,000.00 and lease payments of $135,000.00, the debtors owed one of the franchisor's other companies approximately $1,856,000.00 for goods sold and delivered as of February 28, 1989.

8. The notices sent provided, in the case of twelve of the franchises, that unless the debtors paid all amounts due within ten days of the receipt of the notices, the franchise agreements would terminate automatically. With respect to the other nine

franchises, a thirty day provision was invoked.

9. The debtors received all of the notices of default on March 27, 1989. The debtors filed the within petitions on April 4, 1989 prior to the actual termination of any of the franchise agreements.

10. The franchisor brought this motion for relief from the stay on May 5, 1989. The original scheduled hearing date was May 22, 1989. The parties agreed to reschedule the hearing for June 5, 1989 [within the time period called for by 11 U.S.C. § 362(e)]. The court determined that the matter required a hearing and both parties urged that discovery was necessary for the proper determination at the hearing. The parties did not agree on the form of the order and it was not entered until June 27, 1989. That order provided for the extension of the stay until the hearing date. During the course of discussion concerning the entry of the order, the parties' attention was drawn to *In re Wedgewood Realty Group*, 878 F.2d 693 (3d Cir.1989) which had been decided on June 21, 1989. The attorneys for the franchisor, in a letter to the court dated July 12, 1989, expressly reserved any rights it may have had as a result of that determination.

11. Hearings were ultimately held and a preliminary hearing determined that the automatic stay would remain in effect. At the preliminary hearing held July 26, 1989, the parties indicated that a basis for settlement had been reached. The settlement was not consummated, however, and a final hearing was held on October 23, 25 and 26, November 9 and 16, 1989. At the conclusion of the hearing, the parties sought permission to file Proposed Findings of Fact and Conclusions of Law together with written summations. These submissions were due and were in fact filed on November 22, 1989. On each occasion that the matter was recessed, the court orally determined that the stay should remain in effect.

12. During the course of the hearing, the franchisors alleged various conflicts of interest and mismanagement on behalf of John Diab, the principal of the debtors, and alleged that such conflicts constituted breaches of the franchisees' promises to utilize their best efforts to promote the development of the business. This testimony and any findings based thereon are irrelevant to the within determination.

13. The franchisors introduced significant evidence through an expert witness, one Chandler Joyner, attempting to show that the property of the debtor estates in this action is worthless. Mr. Joyner was a highly interesting, honest and expert witness. He pointed out that the net losses made the business completely valueless. He showed continuing declines in sales and predicated his final conclusion on the fact that the debtors' principal had recognized that significant investment was necessary in order to bring the operations up to the standards required by the franchisor. This bleak picture suggested to Mr. Joyner that only a fool would pay any money for the debtor's property and he sought to convince the court that the mere pursuit of the debtors' rights in the property was an exercise in futility. He utilized as a basis a valuation based upon a return on equity proving in his eyes that no such return was possible. Mr. Joyner, however, conceded that he had not valued Burger King restaurants in the past and was not particularly familiar with the properties involved. In fact, he conceded that he had not set foot in any of the restaurants in question.

14. Against this testimony, the debtors presented their principal, John Diab. While conceding that he is an interested witness, Mr. Diab did testify that not only had he been involved in the purchase of the various restaurants for his own account, but that he had valued many properties for Burger King. In fact, Burger King had relied on him and his valuation on many occasions. He testified that the only valuation that made any sense in dealing with a fast food restaurant was based upon a percentage of volume. He felt that costs were controllable and that while there were problems in the operation of the debtors' properties, they had value based upon the cash flow that existed.

15. This court finds that Mr. Diab's testimony makes eminent good sense. In the

first place, Mr. Diab's experience with Burger King itself tends to prove the validity of his approach. Even more importantly, there are apparently legitimate prospective buyers willing to pay a great deal of money for the operation of these franchises. The only inference this court can draw is that the franchises have significant "going concern" value. If Mr. Joyner is correct, the facts concerning the negotiations herein below set forth cannot possibly have taken place because no responsible prospective purchaser would have offered any money for the franchises. The more logical inference which must be drawn from the testimony of Mr. Diab, the testimony of Mr. Joyner and the facts concerning the negotiations is that the franchises have significant value and that Mr. Diab's method of valuation is appropriate. The court accepts same. The court particularly relies upon the authority of the Bankruptcy Code (11 U.S.C. § 362 and 11 U.S.C. § 506) which permit the court to recognize that different values exist for different purposes within any bankruptcy case.

16. Over the strenuous objection of the franchisors, evidence was submitted concerning the negotiations among all of the parties.[1] On June 16, 1989, the franchisor, through its general counsel, proposed a general basis on which the litigation between itself and the debtors might be settled. The scheme involved an assignment by the debtors of the franchise to some party acceptable to the franchisor. An additional requirement for settlement clearly required an acceptance by National State Bank of a financial arrangement with an assignee. Sometime thereafter, Mr. Diab indicated that that basis contained difficulties.

17. On July 20, 1989, the franchisor sent a letter containing a number of terms of a proposed agreement to one Morris Bailey. Subject to Burger King's approval, Bailey accepted the terms. Mr. Bailey operates a large number of franchises owned by Burger King. The particular letter with the combination of several other letters involved legitimate arm's length negotiations. The letter by its terms was not final. On July 26, during one part of the preliminary hearing, counsel had extensive discussions including telephone conversations with various principals involved. Burger King's counsel specifically stated that its client was willing to negotiate concerning an arrangement involving Bailey. On the following day, July 27, debtors' counsel advised counsel for Burger King that the debtors had reached an agreement with Bailey subject to the finalization of such an agreement.

18. During mid-September of 1989, counsel for the debtors told in-house counsel for Burger King that negotiations between the debtors and Bailey had broken down and that they did not expect an agreement to be consummated.

19. On September 29, 1989, the franchisor wrote a letter to counsel for the debtors stating that the pending settlement negotiations were terminated because "the negotiations between Messrs. Diab and Bailey had broken down and that it appears that a sale of the Restaurants by the Debtors to Mr. Bailey is not likely to occur."

20. During the spring of 1989, it was clear that Mr. Bailey's company had experienced extreme financial distress in its relationship with Burger King. On June 1, 1989 Mr. Bailey's company defaulted on a $330,000 note due Burger King. It entered into a debt restructuring agreement calling

1. Federal Rule of Evidence 408 specifically provides:

Evidence of (1) furnishing or offering or promising to furnish, (2) or accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require exclusion when the evidence is offered for another purpose....

As will be seen, the purpose for which the evidence was submitted was not to show the nature of the actual settlement, but rather to show that the conduct of the franchisors put the debtors into a position where they had a legal right to rely upon the anticipated acceptance of a reasonable proposition by the franchisors.

for major promissory note payments on August 31, 1989 and September 1, 1989. Burger King did not advise the debtors that any such difficulties existed or that Mr. Bailey would not qualify for an assignment. In fact, Mr. Bailey met with Burger King in Miami on September 21 or September 22, 1989 and was told that in order to be an acceptable assignee he would have to cure the financial defaults that existed. On or about September 23 or September 24, 1989, Burger King and Bailey agreed to a settlement proposal to allow Bailey to cure the defects. Mr. Bailey did not meet those obligations, and the promissory notes were accelerated on October 9, 1989.

21. On November 2, 1989 Burger King, for the first time, notified counsel for the debtors that Mr. Bailey was unacceptable as an assignee. Before finding this out, Mr. Diab continued his negotiations with Mr. Bailey and legitimately anticipated that an agreement could be reached concerning such an assignment. At no time before November 2, 1989 did Burger King advise Diab or his counsel of any default or doubts about Bailey.

22. Between the spring of 1989 and the commencement of the hearing on November 9, 1989, Mr. Diab had specific opportunities to negotiate with several other proposed assignees. Certain of the proposed assignees were individuals who worked for Mr. Diab in other capacities, but it is clear that they could have qualified financially.

23. Most importantly, a negotiation was dropped with Carrols, a company which serves as franchisee for a large number of Burger King outlets. Carrols expressed a strong interest in getting into the geographic areas covered by the franchises owned by the debtors. Mr. Diab did not go forward with this negotiation because he anticipated the approval of an agreement with Mr. Bailey.

24. This court specifically finds and infers that had Mr. Diab known that Burger King considered Mr. Bailey an unacceptable assignee, he would have pursued a number of other possibilities.

## ISSUES

The issues for determination are as follows:

1. Did the franchise agreements and the leases terminate by operation of law?

2. Did the automatic stay terminate as a result of the failure to conclude appropriate hearings within the time provided by statute and rule?

3. Is Burger King entitled to relief from the automatic stay for cause?

4. Is Burger King entitled to relief from the stay as a result of the debtors' failure to pay the amounts due under the agreements?

5. Is there any value to the franchises?

6. Is the property in question needed for an effective reorganization if, in fact, there is a reasonable prospect of an effective reorganization within a reasonable period of time?

7. Is Burger King barred by equitable estoppel from denying the debtors the opportunity to assign the various agreements?

## CONCLUSIONS OF LAW

1. Did The Franchise Agreements And The Leases Terminate By Operation Of Law?

Burger King asserts that the receipt of the notices on March 27, 1989 automatically terminated the leases and franchise agreements and that nothing further needed to be done for the termination to take place. It asserts that 11 U.S.C. § 108(b) grants the debtor additional time to perform an act for which there is a grace period, and such additional time is limited to the sixty day extension granted by 11 U.S.C. § 108(b). *Matter of Roach,* 824 F.2d 1370, 1372 n. 1 (3d Cir.1987). *Counties Contracting & Const. v. Constitution Life,* 855 F.2d 1054 (3d Cir.1988).

Burger King further urges that if nothing needs to be done and the contract terminates by its own terms, the right to assume under 11 U.S.C. § 365 is lost. *In re Beverages Int'l.,* 61 B.R. 966 (Bankr.D. Mass.1986). To a similar effect is *In re*

*Beck*, 5 B.R. 169 (Bankr.D.Haw.1980). These cases are, however, distinguishable from the factual situation in the instant matter. In each of the cases cited, the contract itself provided for a termination unrelated to the payment of money. Each of the contracts involved expired without the necessity of any further action. In *Counties Contracting, supra,* a life insurance policy expired unless it was paid for in advance. In *Beck, supra,* no provision for cure was listed in the notices.

On the other hand, the notices in the instant case terminated the contracts "[u]nless payment of all monetary obligations due and owing to BKC ... is received by BKC...." (see Exhibit B 27). The notification did say that the agreements were automatically terminated, but were entitled "Notice of Default" and notified the debtors that they were, in fact, in default, and not *then* terminated.

Clearly, the agreements fit the definition of executory contracts generally accepted by the courts. See Countryman, *Executory Contracts in Bankruptcy: Part 1,* 57 Minn.L.Rev. 439, 460 (1973). That test asks if there is performance due from each party. *Counties Contracting,* 855 F.2d at 1060. In the instant case, there was clearly significant performance due from each party in that use, permission and payment were ongoing obligations. In a case strikingly similar to the within situation, Judge Shiff in *In re Masterworks, Inc.,* 100 B.R. 149 (Bankr.D.Conn.1989) held that where the contractual time to cure a default had not expired, the debtor had the right to assume the contract. Similarly, in *In re Anne Cara Oil Co.,* 32 B.R. 643 (Bankr.D. Mass.1983) the court read the notices as evidencing an *intent to terminate* as opposed to an actual termination. Similarly, when looking at the instant notices, they were to terminate *unless* the debtors made the required payments.

The result of this analysis is a finding that the franchises are properties of the respective estates. 11 U.S.C. § 541. It

was held in *In re Era Central Regional Services,* 39 B.R. 738, 742 (Bankr.C.D.Ill. 1984) that where the notices specifically set forth a time within which to cure defaults, the agreements were not terminated and the debtor was given leave to file a plan in which the defaults would be cured.

It is clear, therefore, that at the time of the filing of the petitions on April 4, 1989, the second step, i.e. the termination (as the result of the failure to cure), had not yet occurred, the contracts were still in effect, and were assumable pursuant to 11 U.S.C. § 365.

2. Did The Automatic Stay Terminate As A Result Of The Failure To Conclude Appropriate Hearings Within The Time Provided By Statute And Rule?

■ On June 21, 1989 during the pendency of this matter, the Third Circuit determined the case of *Wedgewood Realty Group,* 878 F.2d 693. From the moment Burger King became aware of the decision, it consistently asserted that the failure of the court to hold a hearing within thirty days of the filing of the motion or to render a final decision within thirty days of the commencement of the hearing without the entry of an order continuing the stay under 11 U.S.C. § 362(e) and Bankruptcy Rule 4001(a)(2) terminated the stay as a matter of law. *Wedgewood* is predicated on the failure of the court to *enter* an appropriate order. There is no doubt that the entry of an order is governed by Fed.R.Civ.P. 79 and refers to the entry of an order on the civil docket. Fed.R.Civ.P. 79(b).

It is equally evident in the within case that each time the question of a delay was mentioned, the court indicated orally that the stay was to be continued pending the next action of the court.[2] In each case, as is the practice in this district, counsel were directed to submit orders which were to contain provisions extending the stay. The delay in the entry of orders was due solely and completely to the failure of counsel either to submit the appropriate order in a form which the court could sign or to agree

---

**2.** In fact, it was the court, in informal discussion, which brought to the attention of the parties the *Wedgewood* decision.

as directed upon the form of the order. For this court to countenance the use by counsel of the restrictions of the statutes and rules to defeat the implementation of the oral order of the court would compel this court to become party to a grave injustice. Furthermore, the court can envision a circumstance under which a creditor might frivolously refuse to consent to the form of the order, demand a hearing concerning the form of the order and extend the time period beyond the statutory and rule provisions. Such a result, of course, would frustrate the intent and meaning of the provisions of the Code.

█ To the extent that the foregoing does not technically meet all of the requirements of § 362(e) and Rule 4001(a)(2), *Wedgewood* specifically permits the court to rely on the provisions of 11 U.S.C. § 105(a). That section provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).

In *Wedgewood*, Judge Rosenn pointed out that the use of § 105 is conditioned on meeting the standards for injunctive relief. 878 F.2d at 700–701. While Judge Rosenn stated that the court may not impose such relief *sua sponte*, it may find from the evidence presented that the test for an injunction has been met. Clearly, in the instant case, there is and has been a substantial likelihood of success on the merits. Without question, relief from the stay will result in irreparable harm to the debtors and the harm to the movant clearly outweighs the harm to the respondent. In fact, it should be pointed out that if the

creditors were to prevail on their motion they would, in the view of this court, receive a significant windfall and deprive the creditors of the debtor of any possible recovery. Certainly, such a conclusion makes it clear that injunctive relief would not violate the public interest. *Wedgewood*, 878 F.2d at 701. In *Wedgewood*, the court also opined by way of dicta that requisite notice was needed. Since the issue has been before the court and the parties since July 1989 and since there has been no question but that the debtors have sought this relief, Burger King cannot be heard to gainsay adequate notice.

█ As a result of the foregoing, this court concludes that the automatic stay is still in effect and to the extent that it is deemed not to be in full force and effect, this court finds under § 105(a) that the automatic stay must be reimposed.[3]

3. Is Burger King Entitled To Relief From The Automatic Stay For Cause?

█ In *In re Tudor Motor Lodge Assoc.*, 102 B.R. 936 (Bankr.D.N.J.1989), Judge Gambardella found that while a license agreement was assumable, a creditor might be found to lack adequate protection where the debtor failed to meet requirements in the construction of the franchisee's motor lodge. In order to understand the concept, it is necessary to carefully compare the factual basis for the determination in *Tudor* with the case at bar. In *Tudor*, the franchisor (a Days Inn Company) was involved in the construction and renovation of a hotel to be operated under the Days Inn system. The "notice to cure" indicated that the debtor was in default of its obligation by its failure to install signage and its failure to comply with the Operating Policies Manual. *Tudor*, 102 B.R. at 941. In the instant case, the failure to comply with the terms of the MOD manual was not raised until the notices had been sent, the bankruptcy petition filed and the matter listed for hearing before this court. In the

---

**3.** The court is mindful that the burden is normally placed upon the debtor to vigorously pursue its remedies in order to protect the stay. *In re River Hills Apts. Fund*, 813 F.2d 702 (5th Cir.1987). In the instant case, the debtor has pursued its remedy to the greatest extent possible under the circumstances.

instant case, the franchisor was concerned with the receipt of monetary obligations and did not view the deficiencies with any seriousness. In fact, they did not even make inspections until after the petition was filed. Unquestionably, there were problems in management of the debtors' operations and in compliance with the MOD manual, but the reason sought to terminate the agreements was clearly financial.

Burger King relies as well on *In re B–K of Kansas, Inc.,* 69 B.R. 812 (Bankr.D.Kan. 1987). There, Judge Franklin determined that the failure to make post-petition royalty payments impaired the trademarks and service marks because the court found that there was no reasonable possibility of a successful reorganization within a reasonable time. He found that it would be necessary for the franchisor to consent to any plan of reorganization which might occur in that case. No such assertion is made in the instant case, and Judge Gambardella distinguished that situation from that which occured in *Tudor. Tudor,* 102 B.R. at 954. Similarly, specific proof of damage where there was misbranding after notice to the debtor of its wrongful actions was found to be grounds for relief from the stay. This rule was set forth in *Matter of Joyner,* 55 B.R. 242 (Bankr.D.M.D.Ga. 1985).

Thus, this court concludes that no cause has been shown to justify relief from the automatic stay under § 362(d)(1).

4. Is Burger King Entitled To Relief From The Automatic Stay As A Result Of The Debtors' Failure To Pay The Amounts Due Under The Agreements?

■ It is a long-standing rule that another prong of the "for cause" rule in § 362(d)(1) arises from a failure to make payments on property post-petition. *In re Skipworth,* 69 B.R. 526 (Bankr.E.D.Pa. 1987). Such payments are intended to protect the creditor. *In re Kehm,* 90 B.R. 117 (Bankr.E.D.Pa.1988). The Supreme Court has determined that it is the creditor's interest in the property which must be protected. *United Savings v. Timbers of Inwood Forest,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). In the instant case,

the assertion is really the protection of Burger King's position. *B–K of Kansas,* 69 B.R. 812. Reasoning from *B–K of Kansas,* it is clear that if the debtors can propose a plan of reorganization based upon the assumption and assignment of the agreements contained herein, such a plan must necessarily include the curing of all monetary defaults. As is pointed out hereinbelow, the test will be whether there is a reasonable prospect of a successful reorganization. The successful reorganization must encompass a cure of all defaults and the court's determination that there is such a reasonable likelihood of a successful reorganization. It is predicated on a value attributed to the franchises significantly in excess of the balance due and such value provides an "equity cushion" for the creditors.

An equity cushion has been defined as a situation where "the value of the secured property is greater than the total of the debts secured against it." *In re Morysville Body Works, Inc.,* 86 B.R. 51, 58 (Bankr.E.D.Pa.1988). The use of the concept, of course, varies from case to case. *Matter of Lake Tahoe Land Co.,* 5 B.R. 34 (Bankr.D.Nev.1980). In the instant case, the claim Burger King asserts is the right to use, assume, and terminate the franchise and lease agreements and requires the payment of money. The debtors will be required to make all payments current. If they are assumable and assignable, their "going concern" value is many times the amount necessary to cure the default. On that basis, there is an "equity cushion." Since 11 U.S.C. § 365(b)(1) requires adequate assurance for future performance, the potential of such a sale also gives such adequate assurance.

5. Is There Any Value To The Franchises?

■ 11 U.S.C. § 362(d)(2) has a two-fold test. It allows relief from the stay where the debtor has no equity in the property and the property is not needed for a successful or effective reorganization.

Whether or not there is equity in the property in question depends upon the value of the property in question. The factual findings outlined above lead ineluctably to the conclusion that the property has "going

concern" value. If the property had no value, Carrols and the other offerors would not be interested in buying it. If the property had no value, Bailey would not have negotiated, albeit unsuccessfully, from June until November. ·If the property had no value, the desire of Burger King to operate it would be limited solely to the position of its trademark protection. The property has significant value and this court so concludes.

6. Is The Property In Question Needed For An Effective Reorganization? Is There A Reasonable Prospect Of An Effective Reorganization Within A Reasonable Period Of Time?

■ The second prong of the § 362(d)(2) test is the need of the property for an effective reorganization. Initially, it is self-evident that the debtor cannot reorganize without the property. While the debtors have some personal property, the ongoing operation and the cash flow provided by such operation constitute the "going concern" value which makes the property saleable. The facts make it clear that such property is indispensable.

■ Indispensability, however, is not sufficient. *In re Development, Inc.,* 36 B.R. 998 (Bankr.D.Haw.1984). The debtor must also "demonstrate that there exists a reasonable likelihood of a successful reorganization within a reasonable period of time." *Development,* 36 B.R. at 1005. In fact, Justice Scalia in *Timbers,* 484 U.S. at 376, 108 S.Ct. at 632, 98 L.Ed.2d at 751 said that the property must be "essential for an effective reorganization *that is in prospect."* (emphasis in original) In this case, the assumption and assignment of a lease to a prospective purchaser outlines the basis of a plan which can support confirmation. 11 U.S.C. § 1129 clearly contemplates confirmation by use of an asset sale and such a plan would be an outgrowth of the assumption of the assignment of the rights under the franchise agreement.

7. Is Burger King Barred By Equitable Estoppel From Denying The Debtors The Opportunity To Assign The Various Agreements?

■ The final issue raised by the parties is the issue of equitable estoppel. The debtors claim that Burger King, through its actions beginning as early as May, encouraged the debtors to enter into an agreement with Morris Bailey under which the debtor would assume the franchise agreements, assign them to Bailey and under which Bailey would assume the obligations of the debtor to the bank, releasing the debtors and their principals therefrom. The debtors rely upon the basic facts set forth herein pursuant to which Burger King actively engaged in negotiations, encouraged the debtor at each and every turn and, even while saying that negotiations had broken down, in fact blamed such a breakdown on difficulties between the debtor and Bailey rather than upon difficulties between Burger King and Bailey. While it is conceded that Burger King never expressly waived its right to disapprove of a prospective assignee, the debtors assert, and the evidence supports the fact, that Burger King never told the debtors that Bailey had financial problems and that those financial problems would interfere with their approval of Bailey as a prospective assignee. The debtors assert that this conduct was unconscionable and not only did it "lead them down the primrose path", but left them in a position where they were unable to negotiate with other probably more qualified prospective assignees.

The basic principle of law is what legal scholars historically refer to as *estoppel in pais.* Mr. Justice Swayne in *Dickerson v. Colgrove,* 100 U.S. 578, 25 L.Ed. 618 (1880) stated:

> The law upon the subject is well settled. The vital principle is, that he who, by his language or conduct, leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is sternly forbidden. It involves fraud and falsehood, and the law abhors both. This remedy is always so applied as to promote the ends of justice.

100 U.S. at 619. The doctrine is firmly a part of New Jersey law as well. *Miller v.*

*Miller,* 97 N.J. 154, 478 A.2d 351 (1984). Normally it is necessary to find an affirmative misrepresentation in order to invoke the doctrine. *Horsemen's Benevolent & Protective Ass'n. v. Atlantic City Racing Ass'n,* 98 N.J. 445, 487 A.2d 707 (1985). Concealment of a material fact, however, is also recognized by the New Jersey courts. *Foley Mach. Co. v. Amland Contractors, Inc.,* 209 N.J.Super 70, 506 A.2d 1263 (App. Div.1986). The federal courts in this circuit have also held that if a party relies upon concealment of material facts, equitable estoppel arises. *Suburban Transfer Serv. v. Beech Holdings, Inc.,* 716 F.2d 220 (3d Cir.1983).

In the instant case, the facts show that Burger King was concerned about Bailey's ability to perform his obligations in connection with his other franchises. The restructuring agreement occurred on June 1, 1989 during the early part of the Bailey negotiations. Bailey defaulted on August 31, 1989 and September 1, 1989, while intense negotiations were occurring. This court cannot fail to infer and it is unreasonable to ignore the fact that in a multi-million dollar negotiation involving twenty-one separate properties, negotiations will necessarily ebb and flow as parties determine their positions and seek to make the most advantageous arrangement. Were it otherwise, negotiation would be replaced by dictatorship, and proposal by fiat.

█ In the instant case, Burger King had an absolute obligation to tell the debtors that they could not permit an assignment to Bailey unless Bailey was current in his obligations to Burger King and that, in fact, at the time of the discussion, Bailey was not current in his obligations.

The Supreme Court of New Jersey stated it clearly as follows:

> Defendants had an affirmative obligation to impart to plaintiff a clear and accurate picture of his rights and obligations. Plaintiff's reliance on defendants' advice, impliedly including their silence on the critical issue ... fully justified his belief that he was adequately protecting his pension....

*Carlsen v. Masters, Mates & Pilots Pension Plan Trust,* 80 N.J. 334, 342, 403 A.2d 880 (1979).

In addition to Burger King's silence in this case, the conduct in exchanging letters identifying terms and formulating deals clearly lulled the debtor into the false sense of security so that it had a moral certainty that if it could reach a satisfactory agreement with Bailey and National State Bank it would be able to assume and assign the contracts, file a plan and pay at least something to its creditors. Without question, the debtors changed their position by not negotiating with other prospective assignees because they thought in good faith reliance that Burger King would not only approve Bailey as an assignee, but would prefer him to all others. *Fairken Assoc. v. Hutchin,* 223 N.J.Super. 274, 538 A.2d 465 (Law Div.1987). This court has found as fact and concludes as law that the debtors did rely upon both the affirmative actions of Burger King and the silence of Burger King in the face of a legal obligation to disclose and that such reliance was to the detriment of debtors. *Panzino v. Scott Paper Co.,* 685 F.Supp. 458 (D.N.J.1988).

## CONCLUSION

In addition to each of the issues disposed of, it is well for the court to keep in mind the following:

> The purpose of a Chapter 11 reorganization is to revive and preserve a viable business enterprise if possible, especially where it is in the best interest of the creditors. Therefore, when faced with a question of lease termination, the Court must consider the interests of the debtor and its creditors as well as those of the landlord ... (citations omitted) ... Therefore, where continuation of the lease would not overly prejudice the landlord and where enforcement of a forfeiture provision would frustrate or impair a Chapter 11 plan, relief has been granted by the bankruptcy courts....

*Matter of Cordaro,* 20 B.R. 814, 816 (Bankr.M.D.Fla.1982). It is interesting to note that in Cordaro there were allegations of Health Code violations which were not

raised until just before the hearing. Judge Paskay carefully balanced the interests of the parties and determined that the debtor should be permitted to go forward. This did not mean that the debtor had license to continue to violate health codes, but rather that the creditors should continue to be vigilant.

So it is in this case that upon consideration of the findings of fact and conclusions of law set forth herein, it is hereby ordered that the application by Burger King for relief from the automatic stay be denied. It is further determined that the debtors may assume and assign the franchise agreements and leases based upon their best business judgment and in accordance with 11 U.S.C. § 365. The creditor shall retain its right to approve any assignment, provided that a refusal to approve shall not be withheld unreasonably.

Pending the entry of an order in this matter, the docketing of this opinion shall constitute an order determining that the automatic stay shall remain in full force and effect until further order of this court.

Counsel for the debtors shall submit an appropriate order on five days' notice.