**In the matter of Valerie WATSON, Debtor.**

**No. 02–14759/JHW.**

United States Bankruptcy Court, D. New Jersey.

Oct. 30, 2002.

Andrew B. Altenburg, Jr., Esq., Marlton, NJ, for South Jersey Federal Credit Union.

Morton Feldman, Esq., Atlantic City, NJ, for the Debtor.

## *OPINION*

JUDITH H. WIZMUR, Bankruptcy Judge.

In this Chapter 7 case, we must determine the validity of cross-collateralization

provisions by which the South Jersey Federal Credit Union ("Credit Union") seeks to collateralize unsecured advances to the debtor with collateral given by the debtor in connection with a secured loan.

### FACTS

The debtor, a member of the Credit Union since 1985, was accustomed to borrowing money from the Credit Union on an intermittent basis. The loans were secured only by the debtor's shares and/or deposits in her credit union accounts. In 2000, the debtor borrowed money from the Credit Union to purchase a vehicle, which also served as collateral for the loan. The debtor challenges the Credit Union's position that the vehicle collateralizes not only the vehicle loan, but also the debtor's outstanding debt to the Credit Union on otherwise unsecured advances, taken both before and after the vehicle loan.

We begin with an analysis of the documents executed by the debtor creating the credit arrangements and security agreements between the parties. The Credit Union utilizes the LOANLINER Lending Systems format for the documentation of its loans. The LOANLINER documents are form documents created by CUNA Mutual Group, an insurance and bonding company, and are used by many other credit unions throughout the country. The Credit Union offers to its members an open-end credit plan, utilizing this system. To initiate the open-end plan, the Credit Union member must first sign a LOANLINER Application and Credit Agreement ("Agreement"). This Agreement establishes the legal obligation between the member and the Credit Union. In pertinent part, the LOANLINER Agreement[1] directs the debtor as follows:

IMPORTANT The following is part of your LOANLINER Open–End plan. Read this information before signing on page 4.

. . .

HOW THIS PLAN WORKS—The credit union anticipates that you will borrow money (called advances) under this Plan from time to time. . . . The Addendum describes the different types of credit (called subaccounts) available under this Plan. . . .

PROMISES TO PAY—You promise to repay to the credit union all advances made to you under this Plan. . . . The interest rate depends on the subaccount under which the advance is made. . . .

PAYMENTS—The amount of payments for an advance is determined according to the payment schedule in the Addendum. . . .

SECURITY INTEREST—You agree that all advances under this Plan will be secured by the shares and deposits in all joint and individual accounts you have with the credit union now and in the future. Additional security will be required depending on the subaccount under which an advance is requested. . . . Property given as security under this Plan or for any other loan may secure all amounts you owe the credit union now and in the future.

In the signature block of the Application and Credit Agreement, the applicant is reminded to "read all the provisions of the credit agreement and addendum thoroughly before you sign," and agrees, by signing the document, "to be bound by the terms of the agreement."

The Addendum, a separate document which "is incorporated into and becomes a part of your LOANLINER Credit Agree-

---

1. The applicable form at issue in this case is the form that was in use in 1993, when the debtor signed an Agreement on December 18, 1993.

ment", details the various percentage rates, the calculation of the annual percentage rate ("A.P.R.") and other related charges associated with the plan. Phil Ritz, Vice President of the Credit Union, certifies that the Addendum, which is modified from time to time to reflect current rates, is routinely supplied to all Credit Union members, along with signed copies of the Application and Credit Agreement, at the time the Agreement is signed. The Credit Union makes its initial Truth–in–Lending disclosures through this document.

Once the agreement has been executed, the member may apply for extensions of credit under the plan. The Credit Union provides for the advancement of monies through various subaccounts. When an advance is made, it is memorialized in a document called the Advance Request Voucher and Security Agreement ("Voucher"). The Credit Union contends that this Voucher, which is for informational purposes to notify the member of the repayment requirements in connection with an advance, "need not contain Truth In Lending disclosures because those disclosures are provided at the time when the Plan is opened through the Credit Agreement and Addendum." Nevertheless, an updated Addendum reflecting the current rates at the time of the advance is customarily provided at the time the advance is made. The Voucher contains the following language:

> You request the following advance subject to the term and conditions of your LOANLINER Credit Agreement.

On the reverse side of the Voucher, under the designation of "Security Agreement", the document provides:

> THE SECURITY FOR THE LOAN— By signing this security agreement in the signature area or under the state-

ment referring to this agreement which is on the back of the check you received for the advance, you give the credit union what is known as a security interest in the property described in the "Security Offered" section....

WHAT THE SECURITY INTEREST COVERS—The security interest secures the advance and any extensions, renewals or refinancing of the advance. It also secures any other advances you have now or receive in the future under the LOANLINER Credit Agreement, any other loans you have with the credit union, including any credit card loan, and any other amounts you owe the credit union for any reason now or in the future, except any loan secured by your principal residence. If the property description is marked with two stars (* *), or the property is household goods as defined by the Credit Practice Rule, the property will secure only the advance and not other amounts you owe.

In this case, the debtor signed a LOANLINER Application and Credit Agreement with the Credit Union on December 18, 1993.[2] Thereafter, Ms. Watson applied for and was given several unsecured advances, including advances received in 1995, 1997 and 1999, at various interest rates ranging from 11.5% to 16.25%. The last two unsecured advances prior to the filing of the Chapter 13 case were received by the debtor on or about October 20, 2000 and April 30, 2001.

Before the debtor received the last two unsecured advances, the debtor obtained a secured loan from the Credit Union, on October 4, 2000, in the amount of $14,960.00, for the purpose of purchasing a used 1997 Nissan Pathfinder. The debtor executed another Voucher, and was

---

**2.** The debtor executed an earlier LOANLINER application on May 2, 1985. At that time, the Truth–in–Lending disclosures were contained in the Credit Agreement.

charged interest at 9%. Under Section 3 of this agreement, titled "Security Offered", the agreement provided that "IN ADDITION TO THE PLEDGE OF SHARES IN YOUR LOANLINER CREDIT AGREEMENT, THE FOLLOWING PROPERTY SECURES THE ADVANCE:" a 1997 Nissan Pathfinder. Under Section 4 of the agreement, titled "Payment Terms", the Agreement summarizes the outstanding loans as follows:

| AMOUNT APPROVED | OTHER CHARGES + | AMOUNT ADVANCED = | PREV. LOANLINER BALANCE (THIS SUBCONTRACT) + | OTHER LOANS + | NEW BALANCE = |
|---|---|---|---|---|---|
| $14,960.00 | — | $ 14,960 | — | $ 8,817.60 | $14,960.00 |

The vehicle loan Voucher contained the same language about "What the Security Interest Covers" on the reverse of the form as the language noted above on the other Vouchers executed, i.e., that the security interest given "also secures any other advances you have now or receive in the future under the LOANLINER Credit Agreement."

Prior to the filing of her Chapter 7 petition, the debtor made regular payments on account of her unsecured advances and her secured loan separately. When she filed her bankruptcy case on May 10, 2002, she owed $10,431.76 on the secured loan, and $8,702.66 on the unsecured advances.

On June 7, 2002, the Credit Union filed a motion for relief from the automatic stay, contending that the debtor's failure to maintain post petition payments pursuant to the cross-collateralization provisions contained in the loan documents between the parties constituted cause for relief under 11 U.S.C. § 362(d)(1). The debtor filed a cross motion seeking to invalidate the cross-collateralization provisions of the parties' agreements. In the alternative, the debtor seeks to "cram down" the debt to the present value of the debtor's vehicle, and to reclassify as unsecured the amounts remaining due beyond the vehicle's value. As a second alternative, if the cross-collateral arrangements are validated, and/or a "cram down" is not permitted in the Chapter 7 case, the debtor seeks an opportunity to convert the case to a Chapter 13 case. Oral argument was heard in court on July 22, 2002, with a final determination reserved, to be rendered on the papers, pending final submissions.

On September 6, 2002, the parties executed a reaffirmation agreement, whereby the debtor reaffirmed the debt secured by her vehicle in the amount of $10,431.76. The parties agreed that the value of the vehicle as of the filing of the petition was $13,200. The parties agreed further that "[t]he signing of this reaffirmation agreement does not constitute a waiver of the parties' position with regard to the cross-collateral language contained in the loan documents which issue is presently being decided by the Bankruptcy Court."

## DISCUSSION

### I. Cross–Collateralization.

The October 2000 Voucher executed by the debtor in connection with her vehicle loan expressly cross-collateralizes the vehicle loan with pre-existing and future advances. The Voucher provided that the vehicle "secures the advance and any extensions, renewals or refinancing of the advance," as well as "any other advances you have now or receive in the future ..., any other loans you have with the credit union, ... and any other amounts you owe

the credit union for any reason now or in the future." The security clause excepts property that is the debtor's principal residence or where "the property description is marked with two stars (* *)." In the case of such a marking, "the property will secure only the advance and not other amounts you owe." There was no such marking on the vehicle loan Voucher. Ms. Watson, by executing this Voucher, expressly consented to the cross-collateralization between the vehicle loan, the unsecured advances remaining due, and any future advances. This agreement must be tested against the challenges posed by the debtor under Truth in Lending requirements and under state law, including the Uniform Commercial Code and principles governing the enforcement of adhesion contracts.

### A. *Truth in Lending Act and Regulation Z.*

██ The federal requirement for disclosures in consumer credit plans can be found in 15 U.S.C. § 1601 *et seq.* and in the Truth in Lending regulations, specifically Regulation Z, at 12 C.F.R. § 226 *et seq.*, promulgated by the Board of Governors of the Federal Reserve System, pursuant to 15 U.S.C. § 1604(a). The stated purpose of these disclosure requirements is to allow the consumer to "be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a). *See also* 12 C.F.R. § 226.1(b) ("The purpose of this regulation is to promote the informed use of consumer credit by requiring disclosures about its terms and cost."). Regulation Z categorizes its disclosure requirements according to whether the credit plan is open-end or closed-end. Open-end credit is defined un-

der Regulation Z as consumer credit extended by a creditor under a plan in which:

(i) The creditor reasonably contemplates repeated transactions;

(ii) The creditor may impose a finance charge from time to time on an outstanding unpaid balance; and

(iii) The amount of credit that may be extended to the consumer during the term of the plan (up to any limit set by the creditor) is generally made available to the extent that any outstanding balance is repaid.

12 C.F.R. § 226.2(a)(20). *See also* 15 U.S.C. § 1602(I). Closed-end credit simply means "consumer credit other than open-end credit as defined in this section." *Id.* at § 226.2(a)(10). The open-end plan operated by the Credit Union in this case satisfies all three elements: (1) the plan contemplated future transactions (which in fact occurred); (2) a finance charge was imposed on each advance, and (3) the plan utilized a reusable credit line. Debtor's assertions to the contrary are unpersuasive.

Turning to the Truth in Lending Act, Regulation Z applies to each individual or business that offers or extends credit when four conditions are met:

(i) The credit is offered or extended to consumers;

(ii) the offering or extension of credit is done regularly;

(iii) the credit is subject to a finance charge or is payable by a written agreement in more than 4 installments; and

(iv) the credit is primarily for personal, family, or household purposes.

12 C.F.R. § 226.1(c)(1). Clearly Regulation Z applies in this case.

Regulation Z requires the creditor to make certain disclosures "clearly and conspicuously in writing in a form that the consumer may keep." *Id.* at § 226.5(a).

*See also* 15 U.S.C. § 1632. These disclosures must include: the finance charge, when charges accrue, the annual percentage rate, how finance charges are determined, and whether or not a security interest is involved. *Id.* at § 226.6. *See also* 15 U.S.C. § 1637. The disclosures are "required . . . before the first transaction is made under the plan." *Id.* at § 226.5(b)(1).

I conclude on this record that the LOANLINER Application, Addendum and Vouchers utilized by the Credit Union satisfy the disclosures requirements established under federal law. *See In re Kennemer,* 143 B.R. 275 (N.D.Ala.1992) (finding that LOANLINER Agreement and Vouchers satisfied Truth in Lending requirements). The Addendum given by the Credit Union to the debtor with the 1993 LOANLINER Agreement provided information to the debtor about finance charges, when charges accrue, the annual percentage rate, and how finance charges are determined. An updated Addendum was supplied to the debtor with each new Voucher representing a new loan. As in *Kennemer,*

> The unequivocal terms set forth in the Loanliner Agreement disclosed to the [debtor] that any property given as security for advances made pursuant to the Loanliner credit plan secured all amounts presently owed to the Credit Union as well as all sums owed in the future. (footnote omitted). Further, each of the three Loanliner Advance Request Vouchers executed by [debtor] explicitly provided that the specific property designated as security for that particular advance *also* served as security for any future advances made pursu-

ant to the terms of the Loanliner Agreement (footnote omitted). While [debtor] does not argue that he did not receive notice of these provisions, the evidence clearly reveals that each loan document contained explicit provisions directly above the debtor's signature admonishing him to thoroughly read the terms of the contract, as his signature indicated his willingness to be bound by the terms of the credit agreement.

*Id.* at 279. I conclude that the LOANLINER agreement, Addendum and Vouchers satisfy the Truth In Lending disclosure requirements for open-end credit. The debtor's objections in this regard are overruled.

**B.** *New Jersey Law.*

■ In determining whether the Credit Union's cross-collateralization provisions are enforceable, we turn to New Jersey state law. *In re Southern California Plastics, Inc.,* 165 F.3d 1243, 1247 (9th Cir.1999) ("State law controls the validity and effect of liens in the bankruptcy context."); *In re Graham,* 144 B.R. 80, 81 (Bankr.N.D.Ind.1992) (state law determines whether or not dragnet collateralization clause creates an a valid lien). The debtor asserts challenges to cross-collateralization both under the Uniform Commercial Code and under principles governing the enforcement of adhesion contracts.

**1.** *Uniform Commercial Code.*

■ In asserting that the Credit Union's cross-collateralization provisions violate the applicable provision of the Uniform Commercial Code, as adopted in New Jersey, the debtor refers the court to an earlier version of N.J.S.A. 12A:9–204.[3] As

---

**3.** Prior to amendment in 2001, N.J.S.A. 12A:9–204 read:

(1) A security interest cannot attach until there is agreement . . . that it attach and

value is given and the debtor has rights in the collateral.

. . .

recognized by the parties, N.J.S.A. 12A:9–204 was amended twice in 2001 by L.2001, c. 117, approved June 26, 2001, and by L.2001, c. 386, approved January 8, 2002, retroactive to July 1, 2001. Public law 2001, chapter 386 took effect immediately upon approval and was applied retroactively to July 1, 2001. N.J.S.A. 12A:9–710. Pursuant to N.J.S.A. 12A:9–702, this amendment "applies to a transaction or lien within its scope, even if the transaction or lien was entered into or created before this chapter takes effect." For this reason, we will apply the statute as it was amended.[4] N.J.S.A. 12A:9–204 provides:

(a) After-acquired collateral. Except as otherwise provided in subsection (b), a security agreement may create or provide for a security interest in after-acquired collateral.

(b) When after-acquired property clause not effective. A security interest does not attach under a term constituting an after-acquired property clause to:

(1) consumer goods, other than an accession when given as additional security, unless the debtor acquires rights in them within 10 days after the secured party gives value; or

(2) a commercial tort claim.

(c) Future advances and other value. A security agreement may provide that collateral secures, or that accounts, chattel paper, payment intangibles, or promissory notes are sold in connection with, future advances or other value, whether or not the advances or value are given pursuant to commitment.

The debtor correctly contends herein that the "after-acquired property clause" in either version of N.J.S.A. 12A:9–204 would invalidate the provisions in the LOANLINER Agreement proposing to take a security interest in collateral to be given at a future time. The 1993 agreement between the parties provided that all advances were secured by the debtor's shares and deposits in all joint and individual accounts held with the Credit Union now and in the future. The agreement further specified that "[a]dditional security will be required depending on the subaccount under which an advance is requested," and that future acquired "[p]roperty given as security under this Plan or for any other loan may secure all amounts you owe the credit union now and in the future." Although the debtor was placed on notice that the initial advances were secured by her accounts with the credit union and that additional security would be required depending on the advance, and that future collateral offered as security for another advance "may" secure all of the amounts she owed to the Credit Union, in the past as well as in the future, these clauses, standing alone, do not create a security interest in after-acquired property.

However, our focus here is not on subsection (b), but on subsection (c) of Section

---

(3) Except as provided in subsection (4) a security agreement may provide that collateral, whenever acquired, shall secure all obligations covered by the security agreement.
(4) No security interest attaches under an after-acquired property clause
. . .
(b) to consumer goods other than accessions . . . when given as additional security unless the debtor acquires rights in them

within ten days after the secured party gives value.
(5) Obligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment.

4. As it relates to this decision, the statutory provision at issue, N.J.S.A. 12A:9–204, was not substantively changed by the 2001 amendments. I conclude that the same result is reached under either version of the statute.

204. The UCC Comment to N.J.S.A. 12A:9–204 provides:

> Under subsection (c) collateral may secure future as well as past or present advances if the security agreement so provides. This is in line with the policy of this Article toward security interests in after-acquired property under subsection (a). Indeed, the parties are free to agree that a security interest secures any obligations whatsoever. Determining the obligations secured by collateral is solely a matter of construing the parties' agreement under applicable law.

UCC Comment to N.J.S.A. 12A:9–204. Subsection (c) therefore expressly validates the opportunity of parties to cross-collateralize past as well as future advances if the security agreement so provides. The vehicle loan Voucher executed by the parties clearly provides for such cross-collateralization. The agreement provides that the vehicle given as security "also secures" all past and future advances taken by the debtor under the LOANLINER Credit Agreement. I conclude that the cross-collateralization provision entered into between the parties does not violate the provisions of N.J.S.A. 12A:9–204, and may be enforced.

### 2. *Adhesion Contracts.*

Alternatively, the debtor claims that she was not aware of and did not understand the terms of the cross collateralization provisions in the Agreement and the Vehicle Loan Voucher, that the agreement and related Vouchers constituted contracts of adhesion, and that as such, under New Jersey law, the cross-collateralization provisions of the agreements should be invalidated.

■ Under New Jersey law, absent allegations of "fraud, duress, mistake, or illegality", a contract is normally binding on the parties to the contract and each party " 'is conclusively presumed to understand and assent to its terms and legal effect.' " *Rudbart v. North Jersey District Water Supply Commission,* 127 N.J. 344, 353, 605 A.2d 681 (1992) (quoting *Fivey v. Pennsylvania Railroad,* 67 N.J.L. 627, 632, 52 A. 472 (E & A 1902)). However, in the context of "adhesion contracts," which are generally "presented on a take-it-or-leave-it basis, commonly in a standardized printed form, without opportunity for the 'adhering' party to negotiate except perhaps on a few particulars", New Jersey courts do provide for other additional non-enforcement relief. *Id.; Martindale v. Sandvik, Inc.,* 173 N.J. 76, 89, 800 A.2d 872 (2002). However, "the observation that the [documents executed] fit the definition of contracts of adhesion is the beginning, not the end, of the inquiry: we must [then] determine as a matter of policy whether to enforce the unilaterally-fixed terms of the [agreements]." *Id.* at 354, 605 A.2d 681. *See also Martindale,* 173 N.J. at 90, 800 A.2d 872 (determination is fact sensitive and must be done on a case by case basis); *Gras v. Associates First Capital Corp.,* 346 N.J.Super. 42, 48, 786 A.2d 886 (App.Div.2001) ("Significantly, the mere fact that a contract is adhesive does not render it unenforceable; that issue must be determined as a matter of policy.").

In *Rudbart,* the New Jersey Supreme Court agreed that the security notes in question were adhesion contracts, but nonetheless concluded that the investors were still bound by the terms of the contracts, thus declining to allow what it described as "judicial intrusion." Focusing on the facts of the case, the Court found that the notes were publicly traded securities, not consumer necessities, and that the investors "could choose from a vast selection of alternative equity and debt investments, including bonds and notes with var-

ious call and notice provisions." *Id.* at 356, 605 A.2d 681. Because of the degree of selection, the investors could not be said to be compelled. As a security instrument governed by the U.C.C., the Court also found that the contract advanced rather than contravened public policy and that " 'courts should pause before extending judicial doctrines that might dislocate the legislative structure.' " *Id.* at 358, 605 A.2d 681 (quoting *Spring Motors Distribs., Inc. v. Ford Motor Co.,* 98 N.J. 555, 577, 489 A.2d 660 (1985)). Finally, the Court declined to review the "fairness" of the contracts where the terms of the agreements were regulated by both federal and state statutes. *See also Young v. Prudential Insur. Co. of America, Inc.,* 297 N.J.Super. 605, 688 A.2d 1069 (App.Div. 1997) (arbitration agreement was found to be enforceable).

■ As described herein, the LOAN-LINER Agreement and associated Vouchers executed by the parties constitute an adhesion contract. However, as in *Rudbart,* we have insufficient cause to intrude here. First, the debtor presumably had other choices for credit, and was not compelled to seek credit advances or vehicle financing through the Credit Union. The Credit Union was simply one of many financial institutions offering these resources. Second, notions of fairness do not dictate the invalidation of the cross-collateralization provisions. As provided in N.J.S.A. 12A:9–201, "a security agreement is effective according to its terms between the parties, against purchasers of the collateral, and against creditors." That past and future advances were collateralized by the security interest given by the debtor in the 2000 vehicle loan voucher is clear. The language employed explains clearly that the security interest for the loan "secured any other advances you have now or receive in the future under the LOANLINER Credit Agreement." The fact that the information about what the security interest covers is contained on the reverse side of the Voucher does not defeat the enforceability of the provision. The Voucher is a relatively simple form, with the provisions on the reverse side clearly delineated by category, written in plain language, and entirely legible. The debtor's assertion that she did not understand the import of the document cannot defeat its enforcement. Third, this type of credit transaction is extensively regulated by both state and federal statutes, including the Truth in Lending Act, Regulation Z and the Uniform Commercial Code as promulgated in New Jersey. Courts should hesitate to override legislative intent in this area. As in *Rudbart,* I conclude that this court does not have sufficient cause "to justify judicial intrusion."

## II. *Cram–Down.*

■ Having determined that the Credit Union holds a valid cross-collateralized interest in the debtor's vehicle, we turn to the debtor's alternate claim seeking to "cram down" the value of the Credit Union's secured claim to the value of the vehicle and to reclassify the remaining amounts due as unsecured claims. As pointed out by the Credit Union, *Dewsnup v. Timm,* 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992) prohibits stripping down liens in the Chapter 7 context. Although *Dewsnup* involved real property, other courts have applied the *Dewsnup* rationale in the context of personal property, including automobiles. *See, e.g., In re Mobley,* 201 B.R. 851 (Bankr.N.D.Fla. 1996) (automobile); *In re Jordan,* 164 B.R. 89, 91 n. 3 (Bankr.E.D.Mo.1994) ("the difference in the type of collateral is not a significant distinction"); *In re Windham,* 136 B.R. 878, 883 (Bankr.M.D.Fla.1992) (automobile). Debtor's cross motion to re-

duce the secured claim held by the Credit Union is therefore denied.

### III. *Relief from Stay.*

Finally, we come to the Credit Union's motion for relief from the automatic stay because the debtor failed to maintain post-petition payments on its secured claim. Section 362(d)(1) directs that the court shall grant relief from the automatic stay "for cause, including the lack of adequate protection of an interest in property of such party in interest." 11 U.S.C. § 362(d)(1). The debtor's failure to make post-petition payments is sufficient cause to justify granting relief from the automatic stay. Although the debtor is making payment on the vehicle loan, per the reaffirmation agreement, she is not paying on the cross-collateralized advances. *See, e.g., In re Jones,* 284 B.R. 92, 98 (Bankr. E.D.Pa.2002); *In re Independent Mgmt. Assocs., Inc.,* 108 B.R. 456, 464 (Bankr. D.N.J.1989) (long standing rule that failure to make post petition payments constitutes cause). The Credit Union's motion in this regard will be granted, although relief will be stayed for 30 days from the date an order is entered on this motion to afford the debtor an opportunity to convert her case to Chapter 13 and to present a feasible plan. The Credit Union's arguments that such a proposed plan is not feasible are premature and will not be addressed at this time.

Counsel for the Credit Union shall provide an order in conformance with the above opinion.